IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,271

STATE OF KANSAS,
*Appellee*,

v.

EMOND S. GULLEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Words alone are not legally sufficient provocation to support a voluntary manslaughter instruction.

2.

A prosecutor does not commit prosecutorial error by suggesting a defendant could not have been pressured into falsely inculpating himself or herself during interrogation because he or she did not succumb to the pressures on the witness stand.

3.

*Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), prohibits mandatory sentences of life without parole for juvenile offenders. *Miller* does not apply to the aggregate sentence in this case of life with an opportunity for parole after 618 months plus 61 months' imprisonment.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed March 4, 2022. Affirmed.

1

*Jacob Nowak,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

PER CURIAM:  A jury found Emond S. Gulley guilty of committing first-degree premeditated murder and aggravated robbery in 2018 when he was 15 years old. The court sentenced Gulley to life in prison without possibility of parole for 618 months for the murder conviction and a consecutive 61 months' imprisonment for the robbery conviction. Gulley appeals his convictions and his sentences. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 2018, around 12:30 in the morning, someone shot and killed T.C. Security camera footage from a residence and various businesses shows the shooting and the moments leading up to the shooting but does not clearly show the identity of the shooter. In this footage, two people walk together through Wichita before eventually arriving at a residence where the shooting occurs. When confronted with still images of the two people walking through Wichita, Gulley initially identified them as himself and T.C. Gulley eventually recanted and told officers he was not the person in the video. Nonetheless, the jury found Gulley guilty based on the following facts.

On March 24, 2018, Gulley was 15 years old. Around 10 or 11 in the morning, he arrived at Paige Selichnow's home in Wichita, Kansas. Sometime that afternoon or evening, three more people arrived at Selichnow's home: T.C.; Tyrek Murrell, a.k.a. Clutch; and A.S.

2

Around 9 p.m., T.C. and Murrell went outside Selichnow's house to meet Andrew Horton. Horton believed he was there to sell someone a "Ruger nine millimeter E9." Rather than giving Horton money for the gun, Murrell held a firearm to Horton's head and took the 9mm firearm from him. He gave the 9mm to T.C. and the pair went back inside Selichnow's house. Selichnow would later testify that she saw T.C. with a gun inside her house showing it and "clinking" it around.

Sometime after 9 or 10 p.m., A.S. sent a message to some girls asking them to come over. When the girls arrived, T.C., Murrell, and A.S. came out to meet them. Gulley eventually told the girls Selichnow did not want any more people in her house, so the girls left.

Sometime after the girls' visit, T.C. and one of the others left Selichnow's house together and walked through Wichita to a residence at 805 S. Pershing Street. Video surveillance from various businesses and a home security camera show the two walking together. The person with T.C. is wearing a jacket with the words "NIKE SPORTSWEAR" across the back. The pair seem to walk harmoniously until they reach the house on Pershing Street. Then T.C. walks towards the house while the other person walks a few feet in a different direction. The shooter then turns around, walks up briskly behind T.C., pulls something from T.C.'s person, shoots T.C. a number of times, and runs away. T.C. manages to get up and stumble away before the video footage stops.

Jennifer Ruiz lived at 805 S. Pershing. On the night T.C. was killed, she was home with her friend Raneesha Boyd, a.k.a. Nina Washington, and her sister Ariana Flores. Boyd informed Ruiz that T.C. was coming over. Boyd then got in the shower and Ruiz went to sleep. Ruiz awoke to either arguing outside of her window or gunshots. After

hearing the gunshots, Ruiz called the police and went outside to find T.C.'s body lying in the grass.

Officers arrived at the scene around 12:45 a.m. on March 25. They attempted CPR but were unable to revive T.C. From the scene, investigators recovered six 9mm bullet casings and several bullet fragments and found impact marks from projectiles.

Following various evidentiary leads, detectives went to Selichnow's house on March 26, 2018, looking for witnesses. Selichnow said there was no one else home and agreed to let them look inside. Detectives found Gulley hiding shirtless in a closet. As Gulley left the house, Selichnow put a jacket around him. Officers later identified it as the Nike jacket the shooter was wearing on the security footage.

On March 28, 2018, officers arrested Gulley and a man named Douglas Florence outside near Selichnow's house. Gulley had the 9mm Ruger in his pocket. Forensic scientists would later determine that the six cartridge cases recovered from the scene of T.C.'s murder were fired from this weapon. Florence was wearing a backpack that had the Nike jacket inside. Florence would later testify that Gulley put the windbreaker in the backpack before the two left Selichnow's house.

When detectives first interviewed Gulley, he told them he had been with T.C., Murrell, and A.S. on the night T.C. was murdered, but that the other three left Selichnow's house and T.C. called him at 12:07 to tell him he was at A.S.'s house. When detectives confronted Gulley with cell phone records and other evidence that put the four of them at Selichnow's house at 12:07 a.m., Gulley changed his story. Gulley told detectives that T.C. had called him while he was in the bathroom and told him he was going to his cousin's house and Gulley decided to walk with him. Gulley told detectives he and T.C. separated at the "C Store," which is two blocks from where the shooting

4

occurred. Detectives showed Gulley a series of photographs from the videos that had captured his walk with T.C. Gulley identified the two people in the video as himself and T.C. He told detectives that the last image was captured immediately before he and T.C. separated. When a detective told Gulley that the image was taken right before T.C. was shot, Gulley changed his story once more. He told the detective that the people from whom the 9mm was stolen drove up to him and T.C. when they were standing outside of the residence, the two of them ran, Gulley heard gunshots, and T.C. was killed.

The State charged Gulley as a juvenile with first-degree premeditated murder and aggravated robbery. The court ordered Gulley be detained in a juvenile facility.

While Gulley was in detention awaiting further proceedings, the State initiated a second prosecution against him for acts that allegedly occurred while Gulley was detained. The State averred that on June 24, 2018, Gulley lured a corrections officer to his cell and, when she opened his door, Gulley beat her, demanded her keys, and removed her belt and radio. When the officer broke free, Gulley allegedly took her keys and unlocked the door to another juvenile's cell. For these alleged acts, the State charged Gulley as a juvenile with aggravated robbery and battery of a law enforcement officer.

The State eventually moved to prosecute Gulley as an adult in this case and the case stemming from the alleged acts in the detention center. After a hearing during which the court considered evidence from both cases, the court granted the State's motion. Gulley pleaded guilty to the charges against him for the incident at the detention facility and went to trial over the charges stemming from T.C.'s murder.

Gulley testified in his own defense at trial. This testimony differed from what he had previously told detectives. He confirmed that he, T.C., Murrell, and A.S. had been together smoking marijuana at Selichnow's house on the night T.C. was killed. He

5

confirmed that some girls drove over to the house and left after visiting outside. Gulley testified that T.C. had a 9mm that night that T.C. and Murrell had stolen from Horton and that T.C. was keeping it in his pants when he was not waving it around. Gulley said that sometime around 11 p.m. or 12 a.m. T.C. told him he was going to leave and that when Gulley returned from the restroom, both T.C. and Murrell were gone. He testified that sometime after 12 a.m., Murrell returned to the house alone and told him that T.C. was gone. Gulley said they smoked more marijuana and fell asleep until the next morning. Gulley testified he was not the person with T.C. in the video footage. He said that he lied to detectives when he told them he was the person in the video because his mind had not been "functioning as it should" and he did not want to "snitch" on Murrell.

The jury found Gulley guilty of both charges. The district court held a joint sentencing hearing for the convictions in this case and those stemming from the incident at the detention center. The court concluded Gulley had a criminal history score of "B" based on the convictions from the incident at the jail. Gulley did not object to this score. The court then sentenced Gulley to life without possibility of parole for 618 months for the murder conviction and a consecutive 61 months' in prison for the aggravated robbery. Gulley appealed.

DISCUSSION

*Instructional error*

Gulley argues the district court should have offered an instruction on voluntary manslaughter-heat of passion.

This court reviews claims of jury instruction errors in a number of steps. First, it considers whether it "'can or should review the issue, i.e., whether there is a lack of

6

appellate jurisdiction or a failure to preserve the issue for appeal.'" *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). If review is appropriate, this court may decide whether there was error below. To do so, it determines whether the instruction would have been legally and factually appropriate. *Holley*, 313 Kan. at 253-54. This decision is subject to unlimited review. If this court finds error, it decides whether the error was harmless. If the issue was not preserved, reversal is appropriate only if the defendant shows clear error by "'firmly convinc[ing] [this court] the jury would have reached a different verdict had the instruction error not occurred.'" *State v. Buck-Schrag*, 312 Kan. 540, 550, 477 P.3d 1013 (2020) (quoting *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 [2018]).

*Reviewability*

Gulley concedes that this claim of error was not properly preserved. He initially requested an instruction on voluntary manslaughter-heat of passion. But, at the instruction conference, the court said it did not see any evidence to support such an instruction and defense counsel replied: "Candidly, Judge, I think the Court has to give any lesser that it believes is applicable. Initially, we requested manslaughter, but based on the facts, I can't in good faith, ask the Court to give the instruction, as it doesn't apply." Based on this withdrawal of the instruction request, Gulley concedes this court's review should be for clear error.

The State takes this one step further. It argues that the court should not consider this issue because Gulley invited any error.

"Under the invited error doctrine, a litigant may not invite error and then complain of that same error on appeal." *State v. Willis*, 312 Kan. 127, 131, 475 P.3d 324 (2020). This court has refused to consider claims of instructional errors under this doctrine when

7

the trial court gave instructions that the defendant requested or agreed to at trial. See *Willis*, 312 Kan. at 131; *State v. Pattillo*, 311 Kan. 995, 1014-15, 469 P.3d 1250 (2020); *State v. Fleming*, 308 Kan. 689, 707, 423 P.3d 506 (2018); *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012).

Gulley argues this case is more like that in *State v. Soto*, 301 Kan. 969, 983-84, 349 P.3d 1256 (2015), where this court concluded the defendant had not invited instructional error. In *Soto*, the State proposed jury instructions for first-degree murder, second-degree intentional murder, and voluntary manslaughter. At the instructions conference, the district court told the parties there was no evidence to support the lesser included offense instructions for second-degree murder or voluntary manslaughter. The parties agreed. On appeal, the defendant argued it was clear error when the court did not instruct on intentional second-degree murder. This court ruled the defendant had not invited any error because "[d]efense counsel made no affirmative request to omit a second-degree murder instruction nor did defense counsel decline an offer by the court to give the instruction." *Soto*, 301 Kan. at 984. The court explained that "[d]efense counsel acquiesced to the trial judge's ruling rather than requested the instruction not be given." *Soto*, 301 Kan. at 984.

We agree with Gulley. Here, Gulley requested an instruction, and when the court stated that there was no evidence to support the instruction, defense counsel conceded that he could not in good faith ask for the instruction. His acquiescence does not bar him from raising this instructional error on appeal.

*Error*

Because voluntary manslaughter is a lesser included offense of first-degree murder, it would have been legally appropriate for the court to instruct on voluntary

8

manslaughter in this case. *State v. Gallegos*, 313 Kan. 262, 267, 485 P.3d 622 (2021). We move on to consider whether it would have been factually appropriate.

Voluntary manslaughter-heat of passion is "knowingly killing a human being committed: (1) Upon a sudden quarrel or in the heat of passion." K.S.A. 2020 Supp. 21-5404(a). "The core elements of voluntary manslaughter are an intentional killing and a legally sufficient provocation." *Gallegos*, 313 Kan. at 267. Legally sufficient provocation is provocation that "deprive[s] a reasonable person of self-control and cause[s] that person to act out of passion rather than reason." *Gallegos*, 313 Kan. at 267. This is an objective standard. *Gallegos*, 313 Kan. at 267.

Gulley argues there were facts that suggested whoever killed T.C. did so after a sudden quarrel. He insists there is evidence that T.C. argued with the shooter seconds before T.C. was killed. He points to Jennifer Ruiz' testimony that, prior to hearing gunshots, she thought she heard people arguing. He also avers that the security footage shows T.C. say something to the shooter right before the killing.

Gulley contends this sudden quarrel was legally sufficient provocation because there was no evidence of an ongoing quarrel and the murder happened quickly. He relies on *State v. Uk*, 311 Kan. 393, 400, 461 P.3d 32 (2020), where this court rejected an argument that voluntary manslaughter was factually appropriate because there had been an ongoing quarrel between the victim and defendant and the killing took place over a significant length of time.

The State argues that Gulley misconstrues the evidence. It asserts that Ruiz clarified the argument she thought she heard was a dream. The State also avers that, because the security video has no audio, Gulley is merely speculating when he contends that T.C. said something to the shooter. The State also contends that even if the facts

would support a finding that T.C. and Gulley argued before the shooting, words alone do constitute legally sufficient provocation to support a voluntary manslaughter instruction.

We conclude the instruction was not factually appropriate. The parties disagree about whether the evidence shows a sudden quarrel, and for good reason. Neither Ruiz' testimony nor the video clearly indicates whether there was an argument before the shooting. At trial, Ruiz testified:

> "I heard arguing outside of my bedroom window. But at the time I was in— I was trying to fall asleep, I was in a deep sleep, so I thought I was dreaming. And then I heard a gunshot, and I think it was more than one, and then I just heard a scream."

When the prosecutor asked her if gunshots were all she heard, she replied, "No, sir . . . I heard arguing, a lot of people arguing, it sounded like a group of people. And that's literally it." But when the prosecutor asked, "You felt like maybe parts of what you were hearing were maybe dreams?" she replied, "Yes, sir." The prosecutor questioned whether the gunshots were what "woke you up or were you already awake when you heard the gunshots?" She answered, "No, that's what woke me up." And the video is grainy and without sound, so it is difficult to tell whether T.C. and the shooter exchange words immediately before the killing.

This evidence does not definitively indicate there was or was not an argument. But, even assuming there was a "sudden quarrel" before the killing, Gulley fails to explain how this quarrel constituted legally sufficient provocation. As the State points out, this court has said that words alone are not legally sufficient provocation. *State v. Stafford*, 312 Kan. 577, Syl. ¶ 2, 477 P.3d 1027 (2020).

Gulley argues that words were not the only provocation. He points to "the suddenness of the quarrel, the brevity of the offense, the lack of ongoing dispute, and the

lack of any alternative explanation for the offense." But he has not cited any additional provocation; he has cited evidence that he thinks supports his notion that the quarrel led the shooter to kill T.C. Consequently, Gulley has not overcome this court's holding that words alone are insufficient to constitute legally sufficient provocation.

In the alternative, Gulley asks this court to overrule its holding that words alone are insufficient provocation to support a voluntary manslaughter instruction. He argues that this holding makes heat of passion voluntary manslaughter "superfluous" to imperfect self-defense voluntary manslaughter because "it is difficult to envision an action, sufficiently inflammatory as to cause a witness to that action to lose control of their actions and reason, which is not already encompassed by the imperfect defense of self, another, or property theory."

This argument is unpersuasive. Gulley ignores a significant difference between voluntary manslaughter and imperfect self-defense: the latter requires a showing that the defendant had an unreasonable but honest belief that deadly force was necessary. K.S.A. 2020 Supp. 21-5404(a)(2). Heat of passion voluntary manslaughter has no such requirement. K.S.A. 2020 Supp. 21-5404(a)(1). Considering this difference, Gulley's argument fails. The court did not err when it found the evidence did not support an instruction on voluntary manslaughter.

*Prosecutorial error*

In his next issue, Gulley argues the prosecutor commented on his credibility during closing argument and that this constituted prosecutorial error. He points to the following comment:

> "He wants you to believe that Detective Relph somehow pressured him into making all of
> these admissions. But you saw him in court, he was able to hold his own with Mr.

11

Edwards, he was certainly able to hold his position and be firm with what he thought—with what his testimony was. That doesn't make any sense."

The State responds that this was a permissible comment based on the evidence.

This court analyzes a defendant's claim of prosecutorial error in two steps. First, it determines whether error has occurred by analyzing whether "'the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial.'" *State v. Anderson*, 308 Kan. 1251, 1260, 427 P.3d 847 (2018) (quoting *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 [2016]). If error occurred, this court "'determines if that error prejudiced the defendant's right to a fair trial.'" 308 Kan. at 1260. The State can show there was no such prejudice if it establishes, "in light of the entire record," "'there is no reasonable possibility the error contributed to the verdict.'" 308 Kan. at 1260.

We have routinely explained the general rule governing prosecutorial error:

"'A prosecutor has wide latitude in crafting arguments and drawing "reasonable inferences from the evidence but may not comment on facts outside the evidence." Any argument "must accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.'" [Citations omitted.]' *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015)." *Anderson*, 308 Kan. at 1261.

A prosecutor steps outside this wide latitude when the prosecutor states "'his or her personal belief as to the reliability or credibility of testimony given at a criminal trial.'" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015). This is "because such comments are 'unsworn, unchecked testimony, not commentary on the evidence of the

12

case.'" *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011) (quoting *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]).

In *State v. Sean*, 306 Kan. 963, 399 P.3d 168 (2017), this court identified cases in which prosecutors erred when they explicitly stated that witnesses lied or were not credible. 306 Kan. at 979 (citing *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 [2005] [improper to call defendant a liar and comment "'the truth shows you beyond a reasonable doubt the defendant is guilty'"]; *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000] [improper to repeatedly tell jury defendant and defendant's counsel had lied without connecting it to evidence]; *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 [2014] [improper to say witnesses or their statements were not credible]).

*Sean* distinguished improper comments on credibility from those in which a prosecutor "observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial." 306 Kan. at 980. As examples, this court cited *Duong*, 292 Kan. at 831-32, and *State v. Davis*, 275 Kan. 107, 122-23, 61 P.3d 701 (2003). In *Duong*, the defendant was accused of touching a child's penis in a public restroom. The child reported the incident immediately upon leaving the restroom. Duong initially told police no one else had been in the restroom when he entered. He eventually amended this statement, telling police there were two or three people in the restroom when he entered and when he left. He denied touching the child. In closing, the prosecutor argued A.C. and the State's theory were "so credible" because "[A.C.] told right away . . . . He came right out of that bathroom and he said mom, that guy in there tried to touch me. It's so credible because of that.'" *Duong*, 292 Kan. at 827. The State contrasted that with the defendant's credibility, arguing he was not credible because his story changed under pressure. This court was satisfied that "the prosecutor's remarks fit within the context of an overarching evidence-based argument that A.C.'s story was more believable than Duong's." *Duong*, 292 Kan. at 832.

Similarly, in *Davis*, the victim of a kidnapping and sexual assault, S.K.F., reported her account of the criminal acts immediately after they took place. The defendant denied the allegations when he testified at trial 10 months later. This court held the prosecutor was within permissible bounds when he said "I would suggest . . . if you use your common sense, you'll know that when a person is in an emotional state . . . that what comes out of their mouth is more likely the truth than something that comes ten months later with plenty of time for reflection and creation." *Davis*, 275 Kan. at 122. It was also acceptable for the prosecutor to tell the jury, "I would suggest to you that the evidence has shown that [S.K.F.] should be believed by you and that you should return verdicts on all of those counts." *Davis*, 275 Kan. at 122. And this court found no error in the prosecutor's statement that "'[t]he defense would have you believe that [S.K.F.] set this whole thing up . . . . And I would suggest to you that that would require someone who had very, very high intelligence, very, very cold, cold blood. And from [S.K.F.]'s testimony, I would suggest to you that simply is not the case.'" *Davis*, 275 Kan. at 123.

First, Gulley argues the prosecutor's statements were improper comments on his credibility. He insists that the prosecutor's evaluation of his trial performance—that Gulley "was able to hold his own" and "be firm with what he thought"—was improper. He also argues that even if the prosecutor's comments can be characterized as inferences based on evidence, they were improper because they were *unreasonable* inferences. Gulley contends it is unreasonable to assume he was not pressured into giving a false statement to the officers during interrogation based on his performance while testifying at trial. He avers that giving testimony at trial is entirely different from answering questions during a police interrogation. He points out that his interrogation occurred less than an hour after his arrest, that officers outnumbered him during the interrogation, and that he had no idea what the evidence was during the interrogation. In contrast, he asserts, his

14

cross-examination occurred well after the arrest, it was one-on-one, and he was aware of the evidence against him.

The State argues the prosecutor's statement "[t]hat doesn't make any sense" was appropriate because it was not an opinion, but a conclusion based on the evidence—Gulley's testimony that "he was able to withstand questioning by detectives and deny their accusations," and his ability to withstand "the crucible of cross-examination and tell a consistent story." To the State's point, there is caselaw that supports the notion that a witness' performance during testimony can, in itself, offer evidence of credibility. *State v. Todd*, 299 Kan. 263, 285, 323 P.3d 829 (2014) (A jury is permitted to consider the demeanor of a witness, as well as his or her words.); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008); *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014).

We agree with the State's position. First, the statements describing Gulley's demeanor during trial cannot run afoul of rules prohibiting commentary on witness credibility because they were not comments on Gulley's credibility; they were an evaluation of Gulley's trial performance.

Second, the prosecutor did not paint Gulley's story that he was pressured into making false statements as unbelievable based on his own opinion; he rested it on Gulley's demeanor and consistency as he was testifying. Because a prosecutor may make reasonable inferences about credibility based on the evidence, the prosecutor's statement that it did not "make sense" that Gulley would have succumbed to pressure and given a false story was permissible.

And, finally, we reject Gulley's assertion that this was an unreasonable inference. While there are undeniable differences between interrogation and cross-examination, the latter is not a pressure-free encounter. "The object of cross-examination is to test the truth

15

of statements of a witness made on direct examination." 98 C.J.S. Witnesses § 509. This often takes the form of rigorous questioning regarding gaps or weak points in a witness's account. See *State v. Marshall*, 294 Kan. 850, 869, 281 P.3d 1112 (2012) ("counsel rigorously cross-examined [the witness] about inconsistencies in his descriptions and identifications"); *State v. Shadden*, 290 Kan. 803, 834, 235 P.3d 436 (2010) (officers subject to "rigorous cross-examination regarding" their reliance on field sobriety tests to make an arrest). Consequently, the inference that Gulley could not have been pressured into falsely inculpating himself during interrogation because he did not succumb to the pressures on the witness stand is reasonable enough.

We conclude Gulley has failed to show the prosecutor erred.

*Cumulative error*

Gulley argues that, even if the instructional or prosecutorial error alone do not require reversal, the cumulative effect of the errors prejudiced his right to a fair trial and entitle him to a new trial.

This court "may reverse when the totality of the circumstances demonstrate that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial." *State v. George*, 311 Kan. 693, 709, 466 P.3d 469 (2020). There must be two or more errors to support a reversal based on cumulative error.

Because we conclude there was no error, the cumulative error doctrine is inapplicable.

16

*Eighth Amendment challenge*

Finally, Gulley argues his sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment under the principles announced in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In *Miller*, the Supreme Court held that mandatory life without parole for juvenile offenders violates the Eighth Amendment because it prevents the court from considering youth before imposing the sentence. 567 U.S. at 479-80. In this case, the district court sentenced Gulley to life without possibility of parole for 618 months for the murder conviction and a consecutive 61 months' imprisonment for the aggravated robbery conviction. Gulley urges us to hold that *Miller* prohibited this sentence because it is the functional equivalent of life without parole. We reject Gulley's claim.

Gulley failed to present this argument in the district court. The State argues that, consequently, we cannot consider the claim now. But Gulley asks us to reach the issue under one of the exceptions to the preservation rule, averring his claim "'involves only a question of law arising on proved or admitted facts and is finally determinative of the case.'" *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020) (quoting *State v. Hirsh*, 310 Kan. 321, 338, 446 P.3d 472 [2019]).

Because this is a question of law that requires no new fact-finding for its resolution, we will reach the issue.

Our standard of review is de novo. This issue calls on us to consider a categorical Eighth Amendment challenge and to interpret precedential caselaw. Both present legal questions subject to unlimited review. *Wimbley v. State*, 292 Kan. 796, 802, 275 P.3d 35 (2011); *State v. Patterson*, 311 Kan. 59, 72, 455 P.3d 792, *cert. denied* 141 S. Ct. 292 (2020).

17

The Eighth Amendment to the United States Constitution bars cruel and unusual punishments. U.S. Const. amend. VIII. This encompasses a ban on punishments that are disproportionate to the offense or to the offender. *Roper v. Simmons*, 543 U.S. 551, 560-61, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

The United States Supreme Court has held that the death penalty is a categorically disproportionate sentence for juvenile offenders and that life-without-parole sentences are categorically disproportionate for juvenile offenders who commit non-homicide crimes. *Roper*, 543 U.S. at 570-71; *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). This is because juveniles "have a less developed character, are immature and irresponsible, are vulnerable to peer pressure and negative influence, have a high capacity for reform, and are unlikely to be 'irretrievably depraved.'" *State v. Williams*, 314 Kan. 466, 469, 500 P.3d 1182 (2021) (quoting *Roper*, 543 U.S. at 570); *Graham*, 560 U.S. at 68. In *Miller*, the Court ruled that *mandatory* life without parole for any juvenile offender—even one who commits homicide—violates the Eighth Amendment because it will be a rare circumstance in which life without parole is a proportionate sentence for a juvenile. 567 U.S. at 479. Before sentencing a juvenile to life without parole, the *Miller* Court ruled, a sentencer should consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 480.

Recently, in *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307, 1311, 209 L. Ed. 2d 390 (2021), the Court affirmed *Miller*'s ban on mandatory life sentences without parole for juvenile offenders. But it ruled that a court need not make "a separate factual finding of permanent incorrigibility" or create an "on-the-record-sentencing explanation" before it may sentence a juvenile to life without parole. *Jones*, 141 S. Ct. at 1319.

18

In this case, the district court imposed a sentence for Gulley's murder conviction pursuant to K.S.A. 2018 Supp. 21-6620 and K.S.A. 2018 Supp. 21-6623. These statutes generally require the district court to sentence a defendant convicted of premeditated first-degree murder to life imprisonment without parole for 50 years unless there are substantial and compelling reasons to depart to the hard 25. K.S.A. 2020 Supp. 21-6620(c)(1)(A). But, if the defendant's criminal history would place the offender in a sentencing grid block in which "the sentencing range would exceed 600 months if the sentence established for a severity level 1 crime was imposed," then the defendant must serve life with a mandatory minimum equal to "the sentence established for a severity level 1 crime pursuant to the sentencing range." K.S.A. 2020 Supp. 21-6620(c)(1)(B).

When Gulley was sentenced, his criminal history was a B. This score would have required Gulley to be sentenced from a grid box with 554 months as the lower sentence, 586 as the mid-range sentence, and 618 months as the upper sentence for a severity level 1 crime. K.S.A. 2018 Supp. 21-6804. The court agreed with the parties' contention that the court had no option but to impose the upper sentence in the grid box as the mandatory minimum. Consequently, the district court sentenced Gulley to life without possibility of parole for 618 months.

For his aggravated robbery conviction, the district court imposed a consecutive, non-mandatory sentence of 61 months' imprisonment.

Gulley argues this sentence violates *Miller* because it is the functional equivalent of life without parole. To support his argument, Gulley turns to the Court of Appeals opinion in *Williams v. State*, 58 Kan. App. 2d 947, 985, 476 P.3d 805 (2020). There, a panel of the court concluded a hard 50 sentence is the functional equivalent of life without parole and thus unconstitutional under *Miller* unless the sentencing court first

19

considers youth and its attendant characteristics. See *Williams*, 58 Kan. App. 2d 947, Syl. ¶¶ 5, 6. We recently overruled the panel's conclusion that *Miller* applies to non-mandatory sentencing schemes. Because Ronell Williams' sentence was not mandatory, we had no reason to consider the panel's remaining conclusions. *Williams*, 314 Kan. at 473.With our holding here, we overrule the *Williams* panel's conclusion that *Miller* always applies to hard 50 sentences for juvenile offenders.

The *Miller* Court explicitly held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. The Court's clear language dooms Gulley's claim. Nowhere in the opinion does the Court indicate that a sentence that offers parole within an offender's lifetime falls within *Miller*'s protective sphere. As the Supreme Court of Colorado has pointed out, both *Graham* and *Miller* "refer repeatedly and unambiguously to the sentence of life without parole." *Lucero v. People*, 394 P.3d 1128, 1133 (2017). The Court does the same in its most recent opinion regarding this issue. See *Jones*, 141 S. Ct. 1307 (referring only to life without parole sentences).

More than the clear language convinces us *Miller* is inapplicable to sentences that offer parole within an offender's lifetime. The Court's reasoning shows that central to its decision was its observation that life without parole is analogous to a death sentence, which the Court had already forbidden as a punishment for juvenile offenders in *Roper*. *Miller* relied on the *Graham* reasoning to come to its decision. And the *Graham* Court pointed out that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences." 560 U.S. at 69. While "the State does not execute the offender sentenced to life without parole," the Court reasoned, "the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive

20

clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Graham*, 560 U.S. at 69-70.

In adopting the principles announced in *Graham*, *Miller* endorsed *Graham*'s reasoning and its characterization of a life-without-parole sentence. The opinion noted that *Graham* likened life without parole to a death sentence—the "ultimate penalty"—and thus treated it "similarly to that most severe punishment." *Miller*, 567 U.S. at 474-75. It reasoned that "*Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison." *Miller*, 567 U.S. at 477. Life *with* parole does not share these key characteristics.

Unlike life without parole and the death penalty, life with parole offers "hope of restoration" because it provides an opportunity for release within an offender's lifetime. See *Graham*, 560 U.S. at 70. Consequently, *Miller* is inapplicable. With our decision, we join courts across the country that have concluded the same. See *United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019), *cert. denied* 140 S. Ct. 1281 (2020) ("[S]entences of life *with* the possibility of parole or early release do not implicate *Miller*. . . . Nor do sentences to a term of years.") (citing *Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 197 [4th Cir. 2019]; *Goins v. Smith*, 556 Fed. Appx. 434, 440 [6th Cir. 2014] [unpublished opinion]; *Lucero v. People*, 394 P.3d 1128, 1132-33 [Colo. 2017]; *Lewis v. State*, 428 S.W.3d 860, 863-64 [Tex. Crim. App. 2014]; *United States v. Walton*, 537 Fed. Appx. 430, 437 [5th Cir. 2013] [unpublished opinion]; *United States v. Morgan*, 727 Fed. Appx. 994, 997 [11th Cir. 2018] [unpublished opinion]; *United States v. Lopez*, 860 F.3d 201, 211 [4th Cir. 2017]); *State v. Ali*, 895 N.W.2d 237, 246 (Minn. 2017) (rejecting claim that *Miller* applies to aggregate sentences especially because "the Court has not held that the *Miller*/*Montgomery* rule applies to sentences other than life imprisonment without the possibility of parole"); *State v. Gutierrez*, No. 33,354, 2013 WL 6230078, at *1 (N.M. 2013) (unpublished opinion) ("sentence is not life without the possibility of

21

parole, but life with the possibility for parole" so *Miller* inapplicable); *Grooms v. State*, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. 2015) (unpublished opinion) (sentences that provide for the possibility of parole, even if the possibility will not arise before many years of incarceration, do not violate *Miller*).

Gulley's life with parole sentence makes him eligible for parole at 66 years old. Even if we add the sentence for the aggravated robbery, Gulley will be eligible for release at 71. Neither of these ensures that Gulley will be executed by the State or live his entire life in prison. Consequently, *Miller* is inapplicable to his case and his claim fails.

We affirm Gulley's convictions and sentences.

\* \* \*

ROSEN, J., concurring in part and dissenting in part: I agree with the majority's resolution to Gulley's claims of trial error. However, I believe the majority overlooked a sentencing error that, if corrected, could alter the duration of Gulley's sentence. I would remand this case to the district court for a resentencing hearing on that issue before deciding whether Gulley's sentence is constitutional. While I appreciate Justice Standridge's position and find her dissent compelling, I decline to pass legal judgment on Gulley's sentence absent assurance I am considering the correct sentence and arguments specific to that sentence.

"An illegal sentence may be corrected at any time, K.S.A. 2018 Supp. 22-3504(1); and we have the authority to correct an illegal sentence sua sponte." *State v. Johnson*, 309 Kan. 992, 997, 441 P.3d 1036 (2019) (citing *State v. Rogers*, 297 Kan. 83, 93, 298 P.3d 325 [2013]).

The statute governing Gulley's sentence for the murder conviction is as follows:

"(1)(A) . . . [A] defendant convicted of murder in the first degree based upon the finding of premeditated murder shall be sentenced pursuant to K.S.A. 21-6623, and amendments thereto, unless the sentencing judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose the sentence specified in subsection (c)(2) [(c)(2) describes the hard 25].

"(B) The provisions of subsection (c)(1)(A) requiring the court to impose the mandatory minimum term of imprisonment required by K.S.A. 21-6623, and amendments thereto, shall not apply if the court finds the defendant, because of the defendant's criminal history classification, would be subject to presumptive imprisonment pursuant to the sentencing guidelines grid for nondrug crimes and the sentencing range would exceed 600 months if the sentence established for a severity level 1 crime was imposed. In such case, the defendant is required to serve a mandatory minimum term equal to the sentence established for a severity level 1 crime pursuant to the sentencing range. The defendant shall not be eligible for parole prior to serving such mandatory minimum term of imprisonment, and such mandatory minimum term of imprisonment shall not be reduced by the application of good time credits. No other sentence shall be permitted." K.S.A. 2020 Supp. 21-6620(c).

As the majority observes, Gulley had a criminal history score of "B," which would have put Gulley in a grid box with a sentencing range from 554 months to 618 months for a severity level 1 crime. This meant subsection (c)(1)(B) applied at sentencing and required the court to impose "a mandatory minimum term equal to the sentence established for a severity level 1 crime pursuant to the sentencing range." K.S.A. 2018 Supp. 21-6620(c)(1)(B). The court and the parties assumed this required a sentence of life without parole for the highest grid option—618 months. In other words, they all determined the court had no discretion to choose the lower grid options as the mandatory minimum.

23

I believe the district court misinterpreted the statute. K.S.A. 2018 Supp. 21-6620(c)(1)(B) required a minimum term equal to the "sentence established for a severity level 1 crime pursuant to the sentencing range." But there is no single established sentence for a severity level 1 crime. Generally, a sentencing judge imposes the mid-range sentence unless aggravating or mitigating factors "insufficient to warrant a departure" indicate the high or low options should be imposed. K.S.A. 2020 Supp. 21-6804(e)(1). Thus, the most plausible interpretation of the language requiring the court to impose a "sentence established for a severity level 1 crime" is as a directive for the sentencing court to use its discretion to select one of the three sentencing options as if it were sentencing an on-grid crime. K.S.A. 2020 Supp. 21-6620(c)(1)(B).

Another detail confirms my reading of the statute. A criminal history score of "A" places a defendant convicted of a level 1 felony in a sentencing grid box with two options that are greater than 600 months—620 months and 653 months for the middle and high range sentences. K.S.A. 2020 Supp. 21-6804(a). Under an interpretation of K.S.A. 2020 Supp. 21-6620(c)(1)(B) requiring a sentencing court to impose a minimum that is greater than 600 months, the court that encounters this scenario faces a problem: two possible sentences and no guidance on which to select. My reading of the statute does not create such a problem. Under my interpretation, the court would use its discretion to impose one of the three possible sentences in the grid box as a mandatory minimum regardless of how many options over 600 months exist.

The parties have suggested it would be absurd to read (c)(1)(B) to give the judge discretion to impose a mandatory minimum of less than 600 months (586 or 554 in this case) because the provision functions as a sentence enhancer when a defendant facing a hard 50 sentence has a serious criminal history. But (c)(1)(B) does more than require a different (potentially lower) mandatory minimum than the hard 50—it eliminates the

24

court's discretionary authority to depart to the hard 25 for substantial and compelling reasons. In this way, even if it allows the judge to impose a mandatory minimum of 554 months—rather than 600 months under the general sentencing provision—it removes the defendant's opportunity to present mitigating circumstances to justify a substantially lower mandatory minimum. Given this detail, it is not absurd to interpret the provision to allow the court discretion to choose any of the grid sentences as a mandatory minimum.

In sum, the sentencing court interpreted the applicable sentencing statute to mandate a sentence of life without possibility of parole for 618 months. But as I interpret the statute, the court should have considered aggravating and mitigating factors to choose a mandatory minimum of 618, 586, or 554 months. This could make a difference of over 5 years in the length of Gulley's sentence. Because the court imposed Gulley's sentence without any consideration of these factors, the sentence fails to conform to the applicable statutory provisions and is, consequently, illegal. See K.S.A. 2020 Supp. 22-3504(c)(1) (sentence that does not conform to applicable statutory provision is illegal sentence).

Gulley has challenged the length of his sentence as unconstitutional. Before we answer that question, we should start with a legal sentence. Thus, I would remand the case to the district court for a resentencing hearing on whether the middle, high, or low grid box sentence is appropriate as a mandatory minimum in Gulley's case.

WALL, J., joins in the foregoing concurring and dissenting opinion.

* * *

STANDRIDGE, J., dissenting: The majority finds Gulley, a 15-year-old juvenile offender, is not entitled under the Eighth Amendment to have a sentencing court consider his diminished culpability and heightened capacity for change before imposing a sentence

25

of life without the possibility of parole for 618 months. In denying Gulley the opportunity to have a court consider his youth and attendant circumstances before sentencing, the majority draws an indefensible line in the sand by holding—without exception—that if a sentence imposed on a juvenile offers even a glimmer of the chance at release before death, it can never be the functional equivalent of life without the possibility of parole. According to the majority, its decision is grounded in United States Supreme Court precedent holding

- a sentence of life without any chance of parole is analogous to a death sentence, and
- a sentence of life with the opportunity for parole "offers 'hope of restoration' because it provides an opportunity for release within an offender's lifetime." *State v. Gulley*, 315 Kan. __, __, __ P.3d __ (2022), slip op. at 21 (citing *Miller v. Alabama*, 567 U.S. 460, 474-75, 132 S. Ct. 2455, 183 L. Ed. 2d 407 [2012]; *Graham v. Florida*, 560 U.S. 48, 69-70, 130 S. Ct. 2011, 176 L. Ed. 2d 825 [2010]).

First, the majority misreads the analysis and the holdings in the United States Supreme Court cases cited. Second, the majority's holding is too broad because it will apply to even those sentences that do not "offer[] hope of restoration" or "provide[] an opportunity for release within an offender's lifetime." For these reasons, and others, I respectfully dissent. I would find Gulley is entitled under the Eighth Amendment to have a sentencing court consider his diminished culpability and heightened capacity for change before a sentence for his murder conviction is imposed because (1) *Miller* applies to sentences that are the functional equivalent of life without parole; (2) the sentence of life without the possibility of parole for 618 months imposed here is the functional equivalent of life without parole; and (3) the statutory sentencing scheme under which Gulley was sentenced is mandatory.

26

On appeal, Gulley claims the statute under which he was sentenced, K.S.A. 2018 Supp. 21-6620(c)(1)(B), violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution as categorically applied to juvenile offenders. Specifically, Gulley claims the statute precludes the district court from considering the juvenile offender's youth and individual attendant characteristics as a part of the sentencing process as contemplated by *Miller*, 567 U.S. 460. Relevant here, Gulley makes these arguments to support his claim:

1. The 618-month sentence imposed under K.S.A. 2018 Supp. 21-6620(c)(1)(B) as a result of his premeditated first-degree murder conviction is unconstitutional under *Miller* because it is the functional equivalent of a sentence of life without the possibility of parole (LWOP).

2. K.S.A. 2020 Supp. 21-6620(c)(1)(B) is mandatory and does not provide the sentencing court with any discretion to consider a juvenile's youth or attendant circumstances in sentencing as required by *Miller*.

As noted, the majority unequivocally rejects Gulley's first argument without any real consideration of its merits by holding *Miller* is inapplicable to sentences that offer any chance of parole. The majority does not address Gulley's second argument. After giving an overview of the applicable law on the issues presented, I will discuss both of Gulley's arguments.

*Relevant United States Supreme Court law on juvenile sentencing*

Although the majority's holding appears to be grounded in *Jones v. Mississippi*, 593 U.S. __, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021), the controlling case here is *Miller*, 567 U.S. at 474. The *Miller* Court held the Eighth Amendment prohibits sentencing courts from treating children like adults when imposing LWOP sentences. 567 U.S. at 474 ("[I]mposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."). Sentencing courts must "take into account how children are different [from adults], and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 480. Critical to the outcome in *Jones*, however, *Miller* also held the Eighth Amendment allows a LWOP sentence for a juvenile offender if the sentence is not mandatory, meaning the sentencer has discretion to impose a lesser punishment. 567 U.S. at 483. In so holding, the *Miller* Court clarified its "decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* [*v. Simmons*, 543 U.S. 551, 560-61, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)] or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 567 U.S. at 483. So, under *Miller*, a process that allows the sentencer to impose a lesser punishment after considering an offender's youth and attendant characteristics necessarily is discretionary and does not violate the Eighth Amendment.

In *Montgomery v. Louisiana*, 577 U.S. 190, 194, 206, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016), the Court determined *Miller* applied retroactively on collateral review. But in its opinion, the *Montgomery* Court appeared to walk back from the statement in *Miller* that there is no categorical bar to LWOP sentences for a class of juvenile offenders. The *Montgomery* Court emphasized "*Miller* drew a line between children

28

whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." 577 U.S. at 209. Drawing that line "rendered life without parole an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 577 U.S. at 208 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'") (quoting *Miller*, 567 U.S. at 479-80).

In the wake of *Montgomery*, courts across the country split on whether the Eighth Amendment required a sentencing court to make an express determination that a particular juvenile offender is irreparably corrupt before imposing or reimposing a LWOP sentence. Compare, e.g., *Malvo v. Mathena*, 893 F.3d 265, 275 (4th Cir. 2018) (finding an express determination of corruption or permanent incorrigibility prerequisite to imposing LWOP), *Commonwealth v. Batts*, 640 Pa. 401, 472, 163 A.3d 410 (2017) (creating rebuttable presumption against sentencing a juvenile to LWOP), and *Veal v. State*, 298 Ga. 691, 698-99, 784 S.E.2d 403 (2016) (finding trial court needed to make express findings of fact when imposing juvenile offender LWOP), with, e.g., *United States v. Sparks*, 941 F.3d 748, 755-56 (5th Cir. 2019) (finding the trial court need not expressly consider defendant's youth or attendant circumstances if it analyzed federal sentencing factors), *People v. Skinner*, 502 Mich. 89, 97, 917 N.W.2d 292 (2018) ("No such explicit finding is required."), and *State v. Ramos*, 187 Wash. 2d 420, 450, 387 P.3d 650 (2017) ("[Defendant] has not shown that this particular explicit finding is required as a matter of federal constitutional law.").

The United States Supreme Court recently resolved this split in *Jones*. There, a jury convicted Jones of murder for killing his grandfather. Jones was 15 years old when he committed the crime. Under Mississippi law at the time, the sentence for murder was mandatory LWOP. The sentencing court imposed that sentence, which was affirmed on

29

direct appeal. Jones moved for post-conviction relief, arguing his mandatory LWOP sentence violated the Eighth Amendment prohibition against cruel and unusual punishment. While his habeas motion was pending, the Court decided *Miller*, so the Mississippi Supreme Court ordered a new sentencing hearing for the sentencing judge to consider Jones' youth and attendant circumstances before selecting an appropriate sentence. Although the judge acknowledged at resentencing that he had discretion under *Miller* to impose a sentence less than life without parole, the judge decided life without parole remained the proper sentence. Jones again appealed his sentence, arguing the holdings in *Miller* and the then-recently decided *Montgomery* require more than just a discretionary sentencing procedure. According to Jones, the sentencer must make a factual finding on the record that a juvenile offender convicted of murder is permanently incorrigible before sentencing the offender to LWOP. The Mississippi Court of Appeals rejected Jones' argument.

The United States Supreme Court granted Jones' petition for certiorari on this issue "[i]n light of disagreement in state and federal courts about how to interpret *Miller* and *Montgomery.*" *Jones*, 141 S. Ct. at 1313. In rejecting Jones' argument, the Court:

- Reaffirmed its holding in *Miller* that a juvenile homicide offender may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment. *Jones*, 141 S. Ct. at 1321-23.

- Reaffirmed its holding in *Montgomery* that *Miller* applies retroactively on collateral review. *Jones*, 141 S. Ct. at 1321-23.

- Held that if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily will consider the defendant's youth, especially if defense

counsel advances an argument based on the defendant's youth. *Jones*, 141 S. Ct. at 1319.

- Held that the sentencer is

  o not required to make a factual finding of permanent incorrigibility; and

  o not required to provide an on-the-record explanation with an "implicit finding" of permanent incorrigibility. *Jones*, 141 S. Ct. at 1319-22.

- Held the resentencing in Jones' case complied with *Miller* and *Montgomery* because the sentencer had discretion to impose a sentence less than life without parole because of Jones' youth and attendant circumstances. *Jones*, 141 S. Ct. at 1311.

*Relevant Kansas Supreme Court law on juvenile sentencing*

This court recently applied *Jones* to deny relief to a juvenile homicide offender in *Williams v. State*, 314 Kan. 466, 471-72, 500 P.3d 1182 (2021). In *Williams*, a jury convicted the 14-year-old defendant of two counts of premeditated first-degree murder for crimes he committed in 1999. The default sentence for premeditated first-degree murder at the time was a hard 25. K.S.A. 1999 Supp. 22-3717(b)(1) (an inmate sentenced to imprisonment for premeditated first-degree murder shall be eligible for parole after serving 25 years of confinement, without deduction of any good time credits). Nevertheless, K.S.A. 1999 Supp. 21-4635 compelled the court to determine whether the defendant should serve a hard 50 sentence instead of the default hard 25 sentence. The statute required the sentencing court to consider an exclusive set of statutory aggravating circumstances as well as any mitigating circumstances in deciding whether to impose a

31

hard 25 or a hard 50 sentence. See K.S.A. 1999 Supp. 21-4635(b). If the sentencing court found aggravated circumstances existed and they were not outweighed by mitigating circumstances, then the statute required the court to impose the hard 50 sentence. After hearing the arguments of counsel on aggravating and mitigating circumstances and the statements of various individuals supporting Williams, the court imposed concurrent hard 50 sentences for the first-degree murder convictions.

Soon after the United States Supreme Court in *Montgomery* determined *Miller* was retroactive, Williams filed a habeas motion categorically challenging the constitutionality of his hard 50 sentence as applied to juvenile offenders. Williams argued because his hard 50 sentence is the practical equivalent of a life sentence without parole and was imposed under a mandatory sentencing scheme, *Miller* required resentencing so the court could consider his youth and attendant characteristics before resentencing him. The district court denied relief. But a panel of the Court of Appeals reversed, holding

- the constitutional protections afforded under *Miller* are triggered regardless of whether the sentencing scheme is mandatory or discretionary.

- Williams' hard 50 sentence is the functional equivalent of a sentence of life without parole for purposes of the constitutional protections in *Miller*.

- Williams was deprived of the constitutional guarantees afforded under *Miller* because the sentencing court failed to appropriately consider Williams' youth and attendant characteristics before exercising its discretion to impose the hard 50 sentence. *Williams v. State*, 58 Kan. App. 2d 947, 983-84, 476 P.3d 805 (2020), *rev'd* 314 Kan. 466, 500 P.3d 1182 (2021).

The State filed a petition for review with this court.

The United States Supreme Court issued its decision in *Jones* after Williams filed his petition for review but before oral argument. On review, this court found the sentencing court had discretion to choose between a hard 25 and a hard 50 sentence by weighing aggravating and mitigating circumstances, including Williams' youth and attendant circumstances. Finding *Jones* to be dispositive on the issue, this court reversed the panel's holding that the constitutional protections afforded under *Miller* apply to a discretionary sentencing scheme. Citing *Jones*, this court held the sentencing court's ability to exercise discretion necessarily meant the sentencing court exercised that discretion. *Williams*, 314 Kan. at 472 (citing *Jones*, 141 S. Ct. at 1319).

Finally, this court relied on *Jones* to hold the sentencing court was not required to state explicitly on the record that it considered Williams' youth and found him to be permanently incorrigible. *Williams*, 314 Kan. at 470-73 (citing *Jones*, 141 S. Ct. at 1322). Given its finding on this issue, the *Williams* court did not reach the issue of whether a term-of-years sentence could be the functional equivalent of a LWOP sentence under *Miller*. *Williams*, 314 Kan. at 473 ("Even if we were to assume that *Miller* applies to the functional equivalent of life without parole and that the hard 50 is such an equivalent, Williams' sentencing satisfied *Miller*.").

1.  Miller *applies to Gulley's sentence of life in prison without the possibility of parole for 618 months*

Although acknowledging the punishment at issue in *Miller* was a sentence of life without parole and not a lengthy term of years, Gulley claims the rule in *Miller* is triggered here because his sentence of life in prison without the possibility of parole for 618 months is the functional equivalent of a sentence of life without parole. The majority

33

disagrees, holding the *Miller* rule does not apply because Gulley is eligible for parole on his life sentence after serving a term of 618 months in prison. I disagree with the majority's conclusion. For clarity purposes, I divide my analysis into two parts. First, I point out the flaws in the majority's expansive conclusion which deprives a juvenile of Eighth Amendment protections upon a technical, late-in-life chance at parole. Then, I set forth my reasons for concluding Gulley's sentence of life in prison without the possibility of parole for 618 months is the functional equivalent of a sentence of life without parole and, consequently, unconstitutional unless a court first considers his youth and attendant characteristics.

   a. *Term of years as the functional equivalent of life without parole*

In *Graham, Miller*, and *Montgomery*, the United States Supreme Court placed constitutional limits on sentences that may be imposed on children. *Graham* held children convicted of nonhomicide offenses cannot be sentenced to life without parole and must have a "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75. *Miller* and *Montgomery* require the states to provide a juvenile convicted of homicide with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation except in the rarest of instances where the child is found to "exhibit[ ] such irretrievable depravity that rehabilitation is impossible." *Montgomery*, 577 U.S. at 208 (citing *Miller*, 567 U.S. at 479). One could not reasonably argue under these holdings that a sentence fixed for a term of 100 years provides a meaningful opportunity for release, even though it is not characterized as a sentence of life without parole. So, at some point on the sentencing spectrum, a lengthy fixed sentence equates to a fixed life sentence without parole. A contrary conclusion lacks support in reason and practice because it necessarily allows a sentencer to circumvent the Eighth Amendment prohibition against cruel and unusual punishment

34

simply by expressing the sentence in the form of a lengthy term of numerical years rather than labeling for what it is:  a life sentence without parole.

This necessarily includes sentences that technically offer a chance at parole late in a juvenile's life. *Graham*'s discussion regarding the absence of any legitimate penological justification for LWOP is just as persuasive when considering whether the rule in *Miller* is triggered for a lengthy juvenile sentence expressed in a term of years. See *Graham*, 560 U.S. at 71. The Supreme Court considered whether any theory of penal sanction could provide an adequate justification for sentencing a juvenile nonhomicide offender to life without parole and found none. *Graham*, 560 U.S. at 71 ("With respect to life without parole for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation []—provides an adequate justification.").

The *Graham* test, when applied to a lengthy term-of-years sentence before parole eligibility, yields the same conclusion. The *Graham* Court's reasoning regarding retribution is equally applicable to a lengthy term-of-years sentence as it is to one labeled as "life." Sentences must directly relate to the personal culpability of the offender, which is diminished in the case of a juvenile offender. 560 U.S. at 71-72. In terms of deterrence, "'the same characteristics that render juveniles less culpable than adults suggest . . . that juveniles will be less susceptible to deterrence.'" 560 U.S. at 72. Regardless of what the punishment is, children are "less likely to take a possible punishment into consideration when making decisions," especially "when that punishment is rarely imposed." 560 U.S. at 72. There is no reason to believe a juvenile would be deterred from a crime depending on whether the sentence was life without parole or a lengthy number of years that is the functional equivalent of life without parole. Finally, there is no difference in terms of rehabilitation or incapacitation between two sentences that would both incarcerate the defendant for the functional equivalent of the defendant's life. Neither type of sentence

35

contemplates the defendant returning to society for a time period functionally equivalent to a term of life—either as a reformed citizen or as a potential threat.

Most courts considering the issue focus not on the label attached to a sentence but on whether imposing the sentence would violate the principles *Miller* and *Graham* sought to bring about. See *Williams v. United States*, 205 A.3d 837, 844 (D.C. 2019) ("[N]umerous courts have understood *Miller* [and *Graham*] to apply not only to sentences that literally impose imprisonment for life without the possibility of parole, but also to lengthy term-of-years sentences [for one offense or for multiple offenses in the aggregate] that amount to 'de facto' life without parole because they foreclose the defendant's release from prison for all or virtually all of his expected remaining life span."); *Henry v. State*, 175 So. 3d 675, 680 (Fla. 2015); *State v. Shanahan*, 165 Idaho 343, 349-50, 445 P.3d 152 ("However, we have since applied *Miller* to non-mandatory sentences of life without the possibility of parole for juvenile homicide offenders."), *cert. denied* 140 S. Ct. 545 (2019); *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) ("A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison."); *State v. Null*, 836 N.W.2d 41, 70-71 (Iowa 2013) (finding *Miller* applicable to juvenile's lengthy term-of-years sentence); *Commonwealth v. Brown*, 466 Mass. 676, 691 n.11, 1 N.E.3d 259 (2013) ("a constitutional sentencing scheme for juvenile homicide defendants must . . . avoid imposing on juvenile defendants any term so lengthy that it could be seen as the functional equivalent of a sentence of life without parole"); *State v. Zuber*, 227 N.J. 422, 448, 152 A.3d 197 (2017) ("[W]e find that the lengthy term-of-years sentences imposed on the juveniles in these cases are sufficient to trigger the protections of *Miller* under the Federal and State Constitutions."); *Ira v. Janecka*, 419 P.3d 161, 167 (N.M. 2018) (applying *Roper*, *Graham*, and *Miller* to juvenile term-of-years sentences); *State v. Moore*, 149 Ohio St. 3d 557, 572-73, 76 N.E.3d 1127 (2016) (applying *Graham*

36

principles to nonhomicide juvenile offender's term-of-years sentence); *White v. Premo*, 365 Or. 1, 12-13, 443 P.3d 597 (2019) (juvenile lengthy term-of-years sentence was functional equivalent to LWOP under *Miller*); *Commonwealth v. Foust*, 180 A.3d 416, 438 (Pa. Super. Ct. 2018) (applying *Miller* broadly to analyze individual sentences—and not the aggregate—to determine if trial court imposed functional equivalent to LWOP sentence); *Ramos*, 187 Wash. 2d at 438 ("*Miller*'s reasoning clearly shows that it applies to any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation."); *Bear Cloud v. State*, 334 P.3d 132, 144 (Wyo. 2014) (finding process from *Graham* and *Miller* must be applied to "entire sentencing package"); see also *Budder v. Addison*, 851 F.3d 1047, 1059-60 (10th Cir. 2017) (applying *Graham*'s categorical holding to juvenile with no "realistic opportunity for release"); *McKinley v. Butler*, 809 F.3d 908, 914 (7th Cir. 2016) ("[*Miller*'s] concern that courts should consider in sentencing that 'children are different' extends to discretionary life sentences and *de facto* life sentences"); *United States v. Jefferson*, 816 F.3d 1016, 1020-21 (8th Cir. 2016) (although required to weigh statutory sentencing factors "as informed by" *Miller*'s Eighth Amendment jurisprudence, appellate court found no merit to defendant's substantive unreasonableness contention because sentencing court made individualized sentencing decision that took full account of distinctive attributes of youth); *Moore v. Biter*, 725 F.3d 1184, 1187, 1193-94 (9th Cir. 2013) (applying *Graham* to LWOP in context of juvenile who was ineligible for parole until he served 127 years and 2 months of sentence); *People v. Caballero*, 55 Cal. 4th 262, 268-69, 145 Cal. Rptr. 3d 286, 282 P.3d 291 (2012) ("*Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime."); *State v. Riley*, 315 Conn. 637, 660-63, 110 A.3d 1205 (2015) (Defendant was entitled to a new hearing that "gave mitigating weight to the defendant's youth and its hallmark features when considering whether to impose the functional equivalent to [LWOP]" because sentencing court characterized defendant's presentence

37

report as "'pretty unremarkable'" despite "facts in the presentence report that might reflect immaturity, impetuosity, and failure to appreciate risks and consequences."); *Parker v. State*, 119 So. 3d 987, 999 (Miss. 2013) (requiring a trial court to consider the *Miller* factors before entering a sentence of "'life imprisonment with eligibility for parole notwithstanding the present provisions'" of Mississippi's parole eligibility statute); *Steilman v. Michael*, 389 Mont. 512, 519-20, 407 P.3d 313 (2017) (concluding that trial courts must consider mitigating characteristics of youth from *Miller* in juvenile cases regardless of whether a life sentence was discretionary); *State v. Finley*, 427 S.C. 419, 426, 831 S.E.2d 158 (Ct. App. 2019) (interpreting two of South Carolina's Supreme Court cases as establishing "'affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered'"), *reh. denied* August 22, 2019.

I note that, in applying the rule in *Miller*, some of these courts did not ultimately conclude the term of years to which the offender was sentenced rose to the level of cruel and unusual punishment under the Eighth Amendment. But critical to the question presented here—whether a sentence expressed as a term of years can ever be equivalent to a sentence of life without parole—all the courts applied the legal principles announced in *Graham* and *Miller* to a term-of-years sentence. In constitutional terms, these courts both explicitly and implicitly agreed the substantive protections afforded to juveniles in the mandatory life without parole context should similarly flow to juveniles who are sentenced to a term of years that is the functional equivalent of a sentence of life without parole. It stands to reason that, at least for the vast majority of juvenile offenders who are not considered irredeemable, imposition of a sentence for a lengthy term of years that is the functional equivalent of life without parole is an Eighth Amendment violation under both *Graham* and *Miller*.

I am persuaded a sentence expressed as a lengthy term of years that fails to provide an opportunity for release until late in a juvenile's life triggers the Eighth

Amendment protections announced in *Miller*. Nevertheless, I acknowledge there is a split of authority among the states and the federal circuits on the issue. See *Sparks*, 941 F.3d at 754 ("[A] term-of-years sentence cannot be characterized as a *de facto* life sentence."), *cert. denied* 140 S. Ct. 1281 (2020); *Bunch v. Smith*, 685 F.3d 546, 550-51 (6th Cir. 2012) ("While [defendant] claims that his sentence runs afoul of *Graham*, that case did not clearly establish that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole."); *State v. Ali*, 895 N.W.2d 237, 247-48 (Minn. 2017) (holding that *Miller* and *Montgomery* did not apply in case when juvenile offender who was convicted of murdering multiple victims was sentenced to a third consecutive life sentence); *Mason v. State*, 235 So. 3d 129, 134-35 (Miss. App. 2017) (finding juvenile offender was not entitled to *Miller/Montgomery* hearing because he would be released at 57 years of age and had a life expectancy of 70 to 71 years of age—in this case the court also relied on the offender not having offered a life expectancy table into evidence in his post-conviction relief motion); *State v. Zimmerman*, 63 N.E.3d 641, 644, 647-48 (Ohio Ct. App. 2016) (declining to extend *Miller* to situation where juvenile was sentenced to life in prison with parole eligibility after 28 years); *Lewis v. State*, 428 S.W.3d 860, 863-65 (Tex. Crim. App. 2014) (limiting the application of *Miller* to mandatory LWOP cases for juvenile defenders and not applying it to cases in which parole is possible at some time); *Vasquez v. Commonwealth*, 291 Va. 232, 241-43, 781 S.E.2d 920 (2016) (declining to extend *Graham*'s prohibition on LWOP to aggregate non-life sentences that exceed the normal life spans of juvenile defenders); *State v. Gutierrez*, No. 33,354, 2013 WL 6230078, at *1-2 (N.M. 2013) (unpublished opinion) (finding *Miller* did not apply when parole was possible); *Grooms v. State*, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. 2015) (unpublished opinion) (finding *Miller* did not apply when parole was possible); *State v. Williams*, No. 2012AP2399, 2013 WL 6418971, at *2-3 (Wis. Ct. App. 2013) (unpublished opinion) (finding *Miller* did not apply when parole was possible).

While acknowledging the split in authority, I find the conclusion in these cases and in the majority's opinion today—that *Miller* categorically does not apply to any sentence that technically offers a chance at parole—contradicts the reasoning of *Roper*, *Graham*, and *Miller*. The Supreme Court repeatedly emphasized the lessened culpability of juvenile offenders, the difficulty in determining which juvenile offender is one of the very few that is irredeemable, and the importance of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. In fact, the fundamental premise underlying the Court's decisions in both *Graham* and *Miller* is the recognition that juveniles are more amenable to rehabilitation than adults because they are less mature and are not fully developed, they lack the same culpability as an adult, and they have transient behavior.

Those variances do not vanish simply because the sentence is for a lengthy term of years instead of life without parole. The constitutional framework upon which the Court in *Graham* and *Miller* constructed its holdings reflects much more is at stake in juvenile sentencing than merely making sure that parole is possible. A juvenile offender sentenced to a lengthy term of years that is the functional equivalent of life without parole should not be worse off than a juvenile offender sentenced to life in prison without parole who has the benefit of an individualized hearing under *Miller*. Accordingly, I would hold the constitutional protections afforded under *Miller* are triggered when a juvenile offender convicted of premeditated first-degree murder is subject to a lengthy term-of-year sentence that is the functional equivalent of a sentence of life without parole.

   b. *Gulley's sentence of life in prison without the possibility of parole for 618 months is the functional equivalent of life without parole*

In this case, Gulley must serve a minimum of 618 months (51 1/2 years) in prison for his murder conviction before he can be considered for release. My research reveals no

state high court has found a single sentence in excess of 50 years for a single homicide provides a juvenile with a meaningful opportunity for release. See *People v. Contreras*, 4 Cal. 5th 349, 369, 229 Cal. Rptr. 3d 249, 411 P.3d 445 (2018) (same for 50-year-to-life sentence); *Casiano v. Commissioner of Correction*, 317 Conn. 52, 73, 79-80, 115 A.3d 1031 (2015) (same for 50-year sentence); *Null*, 836 N.W.2d at 71 (same for 75-year sentence with parole eligibility after 52.5 years); *Zuber*, 227 N.J. at 428, 448 (110-year sentence with parole eligibility after 55 years and 75-year sentence with parole eligibility after 68 years and 3 months "is the practical equivalent of life without parole"); *White*, 365 Or. at 15 (same for nearly 67-year sentence); *Bear Cloud*, 334 P.3d at 136, 141-42 (same for 45-year-to-life sentence). In finding a juvenile defendant's 50-year sentence to be equivalent to life without parole for purposes of applying *Miller*, the Connecticut Supreme Court relied on *Miller* and *Graham* to construe the concept of life more broadly than biological survival; specifically, it found the United States Supreme Court "implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he [or she] will have no opportunity to truly reenter society or have any meaningful life outside of prison." *Casiano*, 317 Conn. at 78.

Judge Richard Posner has observed a sobering reality that supports the conclusion that a hard 50 sentence is the functional equivalent of life without parole. In a dissenting opinion, he points out the "average life expectancy of an inmate sentenced to life in prison is 58 years; for African-Americans . . . the average life expectancy is 56; and for juveniles sentenced to life the average is 50 1/2 years." *Kelly v. Brown*, 851 F.3d 686, 688 (7th Cir. 2017) (Posner, J., dissenting); see also *Contreras*, 4 Cal. 5th at 362 (studies show "incarceration accelerates the aging process and results in life expectancies substantially shorter than estimates for the general population"). Thus, to the average juvenile, a 50-year sentence might mean release shortly after the national retirement age, but for the average inmate serving their entire life in prison, a 50-year sentence means death in prison.

A hard 50 sentence presents the same constitutional dangers that a life without parole sentence generates and with which the Court was concerned in *Graham* and then in *Miller*. As I explained above, in *Graham*, the Court illuminated the problems with life-without-parole sentences: "no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." 560 U.S. at 79. It also observed that these sentences offer no incentive for a juvenile's growth and development. 560 U.S. at 79. A hard 50 sentence shares these characteristics, especially in light of the lower life expectancy of juvenile offenders and inmates. Even imposed on the youngest possible offender—a 14-year-old—a hard 50 sentence means no chance at release until the juvenile's mid-60s.

The Supreme Court of California made similar observations when ruling a 50-year sentence and a 58-year sentence were the functional equivalents of LWOP for two 16-year-old offenders. The court pointed out that "*Graham* spoke of the chance to rejoin society in qualitative terms—'the rehabilitative ideal', 560 U.S. at 74—that contemplate a sufficient period to achieve reintegration as a productive and respected member of the citizenry." *Contreras*, 4 Cal. 5th at 368 (quoting *Graham*'s emphasis on "the 'chance for reconciliation with society'" 560 U.S. at 79, "'the right to reenter the community,'" 560 U.S. at 74, "and the opportunity to reclaim one's 'value and place in society,'" 560 U.S. at 74). It reasoned that "[c]onfinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." *Contreras*, 4 Cal. 5th at 368.

The *Contreras* court continued, writing that "*Graham* made clear that a juvenile offender's prospect of rehabilitation is not simply a matter of outgrowing the transient qualities of youth; it also depends on the incentives and opportunities available to the juvenile going forward." *Contreras*, 4 Cal. 5th at 368. The court opined that a 50-year sentence offered no incentive for a juvenile to grow. It then reasoned that the 50-year

42

sentence bore "an attenuated relationship to legitimate penological goals under the reasoning of *Graham*" because, while "less harsh than LWOP," it was "still 'an especially harsh punishment for a juvenile'" who has "'diminished moral culpability,'" and "limited ability to consider consequences when making decisions." *Contreras*, 4 Cal. 5th at 369. Furthermore, "a judgment that a juvenile offender will be incorrigible for the next 50 years is no less 'questionable' than a judgment that the juvenile offender will be incorrigible 'forever.'" *Contreras*, 4 Cal. 5th at 369 (quoting *Graham*, 560 U.S. at 72-73).

In line with this analysis, that of many other courts, and my own, I would conclude Gulley's sentence of life in prison without the possibility of parole for 618 months is the functional equivalent of life without parole for purposes of applying the rule in *Miller*.

2. *Mandatory sentencing scheme*

In overruling *Williams*, this court held that *Miller* applies to only mandatory sentencing schemes. Here, the majority does not consider whether Gulley's sentence was mandatory, presumably because it concluded *Miller* did not apply for other reasons. I address this issue now.

As a preliminary matter, I note the facts presented and the applicable law in this case are distinguishable from those in *Williams*. Instead of the hard 50 sentencing statute, K.S.A. 2020 Supp. 21-6620 and K.S.A. 2020 Supp. 21-6623 are the relevant sentencing statutes for first-degree premeditated murder, which is Gulley's primary crime of conviction.

- K.S.A. 2020 Supp. 21-6620(c)(1)(A) requires the district court to sentence a defendant convicted of premeditated murder to the sentence in K.S.A. 2020 Supp. 21-6623. K.S.A. 2020 Supp. 21-6623 provides for life imprisonment without the

43

possibility of parole for 50 years (hard 50) unless, as provided in K.S.A. 2020 Supp. 21-6620(c)(2)(A), there are substantial and compelling reasons to depart to life imprisonment without the possibility of parole for 25 years (hard 25).

- K.S.A. 2020 Supp. 21-6620(c)(1)(B) provides an exception to subsection (c)(1)(A) if a defendant's criminal history would place defendant in a sentencing grid block where the sentencing range exceeds 600 months, and the court imposes the sentence for a severity level 1 crime.

- If the (c)(1)(B) exception applies, then the district court has no discretion to depart to the hard 25, regardless of whether substantial and compelling circumstances exist. Instead, the court must sentence the defendant to life with a mandatory minimum equal to "the sentence established for a severity level 1 crime pursuant to the sentencing range" and "[n]o other sentence shall be permitted." K.S.A. 2020 Supp. 21-6620(c)(1)(B).

When Gulley was sentenced, his criminal history was a "B." Premeditated first-degree murder, the crime of conviction relevant here, is a severity level 1 crime. Based on his criminal history and the severity level of the crime, Gulley's sentence fell into a grid box providing for 554 months as the low sentence, 586 as the mid-range sentence, and 618 months as the high sentence. Subsection (c)(1)(B) applies because the sentencing range in the applicable grid block exceeded 600 months, even though the mid or lower options did not. See K.S.A. 2020 Supp. 21-6620(c)(1)(B) (applies when the "sentencing range" exceeds 600). There are no grid blocks in which all available sentences are over 600 months, so subsection (c)(1)(B) necessarily applies even if some of the sentencing options within the grid box are less than 600 months; otherwise, it is meaningless.

Under the facts here, K.S.A. 2020 Supp. 21-6620(c)(1)(B) gave the judge discretion to impose a mandatory minimum of less than 600 months. Specifically, the judge could have reduced Gulley's sentence from 618 months to either 586 or 554 months. But the primary effect of subsection (c)(1)(B) is not to provide a little wiggle room above and below the hard 50 sentence. Instead, its primary effect is *to eliminate the court's discretionary authority to depart to the hard 25 for substantial and compelling reasons*. So even if the court is allowed to impose a mandatory minimum of 554 months—rather than 600 months under the general sentencing provision—the court has absolutely no discretion to consider mitigating circumstances that may justify a much lower mandatory minimum.

Although the court had discretion under K.S.A. 2020 Supp. 21-6620(c)(1)(B) to impose a lesser sentence within the grid box than it did—down to life without parole for 554 months (46 years and 2 months)—the sentencing scheme is still mandatory as to the 554 months, which is only 4 years less than a hard 50 sentence. A four-year reduction on Gulley's sentence would not change my analysis above, and, consequently, I would conclude the sentencing court was required to consider Gulley's youth and attendant characteristics before sentencing pursuant to this scheme.

45