IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,870

STATE OF KANSAS,
*Appellee*,

v.

LUIS ALVARADO-MERAZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts apply abuse of discretion review to a district court's decision about whether to grant a motion for a new trial in the interest of justice under K.S.A. 22-3501(1). A party asserting an abuse of discretion bears the burden of showing the district judge's decision was (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.

2.

A criminal defendant may have statutory and constitutional rights to be present when an answer to a jury's question is discussed and delivered. Those rights arise under the Confrontation Clause in the Sixth Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and K.S.A. 22-3420(d).

3.

In deciding a claim of prosecutorial error, appellate courts apply a two-step framework. In the first step, the court considers the prosecutor's statements in context to determine whether the prosecutor stepped outside the wide latitude afforded the State to

1

conduct its case in a manner that does not offend the defendant's constitutional right to a fair trial. Prosecutors do not violate this wide latitude by highlighting evidence or discussing reasonable inferences drawn from that evidence so long as their arguments remain consistent with the evidence. But prosecutors do exceed the wide latitude by, for example, misstating the law that applies to that evidence, misstating evidence, commenting on witness credibility, or shifting the burden of proof to the defendant. The second step considers whether the error requires reversal after applying the traditional constitutional harmless error test established in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

4.

Appellate courts apply a three-step inquiry to jury instruction issues, asking: (1) whether the appellate court has jurisdiction or whether the issue has been preserved for review; (2) whether an instructional error occurred, that is whether the disputed instruction was legally and factually appropriate when the entire record is reviewed in the light most favorable to the requesting party; and (3) whether, if error occurred, it is reversible, meaning is there a reasonable probability that any error affected the outcome of the trial in light of the entire record?

5.

The core elements of voluntary manslaughter are an intentional killing and a legally sufficient provocation. To constitute a legally sufficient provocation, the provocation must deprive a reasonable person of self-control and cause that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation justifying an instruction on voluntary manslaughter. Courts apply an objective standard to determine whether the provocation was legally sufficient. And courts perform a gatekeeping function to ensure the purported provocation rises to the objective legal threshold of sufficient provocation.

Appeal from Sedgwick District Court; JEFFREY GOERING and MICHAEL WARD, judges. Oral argument held May 14, 2025. Opinion filed August 1, 2025. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause and was on the briefs for appellant.

*Lance J. Gillett,* assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: A jury convicted Luis Alvarado-Meraz of capital murder for the shooting deaths of his twin brother, Manuel, and Manuel's wife, Lucero Rodriguez. Alvarado-Meraz raises three claims of error in his direct appeal: (1) was his right to be present at all critical stages of his jury trial violated during the jury's deliberations; (2) did the prosecutor err during closing argument; and (3) did the district court err by denying the defense's request for an instruction on voluntary manslaughter as a lesser-included offense of capital murder?

We see no reversible error and thus affirm Alvarado-Meraz' conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On the day Alvarado-Meraz repeatedly shot Manuel and Lucero, Alvarado-Meraz told friends that tensions arose between him and his twin Manuel, who would occasionally be called Manny. Alvarado-Meraz shared an apartment with Manuel and Lucero, and friends and family reported they got along well. No friends testified to knowing of the twins ever fighting physically, although they occasionally argued orally.

3

Two of the twins' friends, Jonathan Manzano and Byron Escoto, regularly hung out with the twins. On the day of the shooting, Manzano and Escoto had been at Alvarado-Meraz' apartment playing video games until the early morning hours. They reported no unusual interactions between the three residents.

Around 7 p.m. that evening, Alvarado-Meraz' neighbors heard pings or noises sounding like hammering on a wall. One neighbor heard the sounds, a short break in the noise, then another burst. Neighbors heard no shouting or signs of a dispute. One neighbor then observed someone running away from the apartment building. The person was slim and wearing a jacket the neighbor thought was yellow or orange but later said it might have been white and reflected fluorescent lighting.

*Alvarado-Meraz texts friends and mother*

During that late afternoon and evening, Manzano was working in a restaurant, and he noticed Alvarado-Meraz had called during the rush hour. Manzano returned the call and told Alvarado-Meraz he was busy and would call later. Manzano reported that Alvarado-Meraz was talking quickly. About 30 minutes later, Manzano saw he had a text message from Alvarado-Meraz, who said, "Goodbye Pelao." Definitions suggested for "Pelao" include dude, homie, and bro.

Alvarado-Meraz also called Escoto around 6 or 7 p.m. Alvarado-Meraz mentioned he had a "little argument" with Manny. Escoto said Alvarado-Meraz was not making any sense and did not sound like he normally did, making him think Alvarado-Meraz might be drunk. Escoto ended the call quickly because he was with his girlfriend. Alvarado-Meraz texted Escoto at 7:18 p.m., "Bro, I shot Many [*sic*]. Where you at? I need you, B." Escoto tried to call Alvarado-Meraz, but Alvarado-Meraz did not answer. Alvarado-Meraz later texted Escoto, "Goodbye, pelao."

4

Alvarado-Meraz texted his mother around 8 p.m. that night, telling her, "Stay strong, Mom. Don't be weak. I love you a lot, you and my dad." His mother responded, but Alvarado-Meraz did not send her any more text messages.

Manzano became concerned after receiving the goodbye message from Alvarado-Meraz. He called Escoto, and they agreed to go to see the twins' parents after Manzano clocked out of work, which was at 10:05 p.m. They and the twins' parents went to the apartment complex. While Manzano and Escoto waited in the car, the parents went to Alvarado-Meraz' apartment. Receiving no response at the door, the twins' father went to the back and saw an open door. He went inside and saw Lucero and his son on the floor. He returned to the car crying and said Manuel and Lucero were dead. The parents contacted the police.

*Alvarado-Meraz contacts others*

After 7 p.m., Alvarado-Meraz began to seek help from friends and, by walking and taking rides from friends and strangers, he moved around the Wichita area. He first phoned Orlando Salaya-Sanchez, who thought Alvarado-Meraz sounded upset. Alvarado-Meraz said he needed help, so Salaya-Sanchez went to meet Alvarado-Meraz near Alvarado-Meraz' apartment. Alvarado-Meraz seemed more anxious than usual as they drove around for a bit. Salaya-Sanchez said that Alvarado-Meraz was mostly quiet but eventually said he shot Manuel. Salaya-Sanchez did not believe Alvarado-Meraz but told him to stop talking because the less he knew the better.

During this conversation and another one the two had around midnight, Alvarado-Meraz told Salaya-Sanchez he had a fight with his twin about their older brother kicking Alvarado-Meraz out of his apartment. Alvarado-Meraz thought Manuel was supporting their older brother's position and was doubting and not listening to Alvarado-Meraz. Manuel called Alvarado-Meraz a "bitch and that's where it went. They got into an

5

argument from that. And it seemed like Luis [Alvarado-Meraz] was mad from Manuel not respecting him." Salaya-Sanchez also asked about Lucero, and Alvarado-Meraz said something like he got her too or she was gone too. The first visit ended soon after they arrived at Salaya-Sanchez' apartment as Alvarado-Meraz left without telling Salaya-Sanchez where he was going.

Alvarado-Meraz eventually had contact with another friend and a stranger who gave him a ride. He told the friend that he had argued with his brother but gave her no details and spent little time with her. The officer who interviewed this friend later testified that he had the impression Alvarado-Meraz described a physical fight rather than a verbal altercation. His interview notes refer to a fight but say nothing about a physical fight. At some point, Alvarado-Meraz ended up in Park City where police stopped him as part of an investigation into a domestic violence call. Once they realized he was not the suspect, they let him go.

All these individuals testified they saw no injuries and did not notice blood on Alvarado-Meraz' clothing. Alvarado-Meraz did ask Salaya-Sanchez for socks, however, which Salaya-Sanchez did not have with him. When Alvarado-Meraz was arrested, blood was found on his sock that could have come from him or his identical twin.

Near midnight, Alvarado-Meraz had his second meeting with Salaya-Sanchez. Alvarado-Meraz told Salaya-Sanchez he threw his phone away at some point that night. During this second visit, Salaya-Sanchez received a call that the police were looking for him at his old residence. Salaya-Sanchez told Alvarado-Meraz he was going to talk to the police. Alvarado-Meraz said goodbye; Salaya-Sanchez estimated they parted around midnight. Salaya-Sanchez testified that Alvarado-Meraz appeared to be "going through something," like he had a mental breakdown and was "saying a bunch of stuff that didn't make any sense."

6

Police arrested Alvarado-Meraz near Salaya-Sanchez' apartment at around 11 a.m. the morning after the shootings.

*Crime scene investigation*

When officers arrived at the apartment following the call from the twins' parents, they found Lucero and Manuel. They also saw bullet casings, blood spatter, a rifle, and a handgun on the floor.

As the investigation continued, a crime scene investigator documented the scene. The investigators recovered 21 bullet casings, 15 from the Glock and 6 from the AK-style rifle. They also found 6 bullet fragments. The crime scene investigator also collected the two firearms found on the scene, a 40-caliber Glock and an AK-style rifle. The Glock was located between Lucero's legs, and the AK-style rifle was by the sliding rear door the twins' father found open. All these were diagramed on a map of the apartment.

In the investigator's testimony, she was asked about the location of the shooter based on the bullet casings, blood spatter, and guns. She said it is impossible to tell "definitively" where a shooter was standing by looking at the bullet casings because guns eject casings from different sides and they can ricochet, discharge unpredictably, or be moved after ejection. With these acknowledged limitations, she concluded from the pattern of the bullet casings and the direction of the bullets that the shooter fired the firearms mostly from a general area that she designated for the jury. She also testified that all bullet fragments and holes were toward the north, meaning that shots moved from south to north. She could not tell which shots were fired first.

Crime scene pictures show Lucero near a chair at the dining table with her head toward the kitchen. A plate of food and Lucero's cell phone are on the table. A pan of food sat on the stove, near where Manuel's body fell. A cheese grater was found by his

body. Bullet casings primarily fell near Alvarado-Meraz' bedroom door, in the dining area, and near or in the kitchen. There was no evidence that either Lucero or Manuel moved after they fell to the floor.

Investigators concluded Lucero was sitting at the dining table when she was first shot in her left shoulder with a bullet that then entered her chest cavity. Based on the location of her plate and her cellphone, she would have been sitting with her left side pointing to Alvarado-Meraz' bedroom. She fell to the ground and was then repeatedly shot in the back. She was shot at least nine times. Manuel was shot in the kitchen. He fell to the floor and was hit at least 11 times, with many of the shots in his back and shoulder.

A pathologist autopsied both victims. Both were shot from an indeterminate distance, meaning no injuries showed the firearms had contact with the skin or were close enough to leave markings on the skin at the time they were fired. Lucero suffered gunshot wounds only, with some abrasions or bruises noted around some of the gunshot wounds. The pathologist identified various wounds on Manuel, most of which were gunshot wounds or wounds caused by bullets. The pathologist identified instances of blunt force trauma and abrasions to Manuel, including on his head, trunk, back, right arm, and left shoulder. The head injury could have been caused by falling and striking something like the kitchen counter or another blunt object as he fell to the floor. The rest of the injuries could be tied to the effect of gunshots. The injuries appeared contemporaneous with the fatal injuries suffered.

The jury deliberated for 90 minutes and found Alvarado-Meraz guilty of capital murder. Alvarado-Meraz brought this direct appeal over which we have jurisdiction. K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (direct appeals to Supreme Court allowed for life sentence and off-grid crimes); K.S.A. 21-5401 (capital murder is an off-grid person felony).

ANALYSIS

As we have noted, Alvarado-Meraz raises three issues on appeal. We determine that no error requires us to reverse his conviction.

ISSUE 1: No violation of right to be present during critical stage of trial

Alvarado-Meraz presented the first issue to the trial court after his attorneys and their staff interviewed some jurors sometime after the close of the case. In these interviews, jurors reported that the jury had questions about premeditation during deliberations. Some jurors thought their question was answered by either the trial judge or a court employee. Alvarado-Meraz' defense team was not told during the jury's deliberations that the jury had questions and did not participate in drafting responses. Given those circumstances, Alvarado-Meraz' attorneys added an issue to his motion for a new trial asking whether the trial court violated Alvarado-Meraz' right to be present at a critical stage of the trial by not allowing him to be present when the court dealt with the jury questions.

The trial judge recognized a potential conflict if he ruled on this issue because handling the jury during its deliberations had been his responsibility. He appointed another district judge to resolve this issue. That appointed judge presided over two days of testimony from some jurors. On the second day, the appointed judge learned his judicial assistant had served as the bailiff during the jury's deliberations. The State had also requested testimony from the trial judge. Recognizing potential conflicts, a senior judge from outside the judicial district was appointed to rule on Alvarado-Meraz' issue about not being present during a response to juror questions. The senior judge presided over a hearing and heard testimony from the trial judge and the presiding juror.

9

The senior judge also issued a written decision that denied Alvarado-Meraz' motion for a new trial. He concluded that Alvarado-Meraz proved no violation of his right to be present during a critical stage of his trial. After summarizing the testimony of each witness, the senior judge noted "there must be proof that an event occurred which warrants the granting of a new trial." But "there is no consensus as to what actually happened. Speculation is not the court's function. Because the record does not allow this judge to make a finding that the claimed error occurred, there is no basis on which to grant a new trial as to" this issue. The senior judge accordingly denied Alvarado-Meraz' motion for a new trial.

Alvarado-Meraz disagrees with this analysis and suggests his right to be present was violated.

### 1.1    *Standard of review and burden*

In considering Alvarado-Meraz' motion seeking a new trial, the senior judge needed to determine whether a new trial was "required in the interest of justice." K.S.A. 22-3501(1). We typically review a decision about whether to grant a new trial by applying an abuse of discretion standard. *State v. Peters*, 319 Kan. 492, 497, 555 P.3d 1134 (2024). A party asserting an abuse of discretion bears the burden of showing the district judge's decision was (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 319 Kan. at 497-98.

Despite this authority, Alvarado-Meraz asks us to apply de novo review to the district court's factual findings, arguing we are in as good a position to review any transcripts of the first two days of testimony on the motion as was the senior judge. But that is not entirely accurate. The senior judge heard the testimony of two witnesses and was thus able to assess their credibility and use that in weighing all evidence. As a court of review, we generally defer credibility determinations to trial courts because of the fact-

finder's ability to observe testimony firsthand. E.g., *State v. Hinostroza*, 319 Kan. 129, 133-34, 552 P.3d 1202 (2024) (Appellate courts "do not reweigh evidence, resolve evidentiary conflicts, or weigh witness credibility."). By doing this, we do not give more weight to the final two witnesses, but we trust the senior judge's assessment of their credibility and his overall assessment of how that testimony fit with the testimony of the jurors and court employee who testified before the other judge. We leave to the senior judge the task he performed of considering the evidence in its totality.

With us reaching that decision, we apply an abuse of discretion standard on the merits. We thus need not address the State's procedural and preservation objection in which it argues Alvarado-Meraz waived his objection to having the senior judge weigh overall credibility. Whether we apply the State's path or the traditional rule that we will not reweigh evidence, we reach the same conclusion and do not consider the evidence de novo. Again, we instead apply the traditional standard of reviewing a denial of a motion for a new trial for an abuse of discretion.

In considering the senior judge's ruling, we must consider the law that applies to Alvarado-Meraz' argument that his constitutional or statutory right to be present was violated. As Alvarado-Meraz argues, a criminal defendant may have constitutional and statutory rights to be present when an answer to a jury question is discussed and delivered in open court. Those rights arise under the Confrontation Clause in the Sixth Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and K.S.A. 22-3420(d). *State v. Harrison*, 311 Kan. 848, 855, 467 P.3d 477 (2020).

Under the United States Constitution, due process protects a defendant's right to be present "whenever his presence [during a criminal proceeding] has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" but does not require the defendant's presence when it "'would be useless, or the benefit but a shadow.'"

11

311 Kan. at 855 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 [1934]). The right to be present may include the right to be present when the court discusses and delivers the answer to the jury's question in some circumstances if the defendant's presence has a reasonably substantial relation to the opportunity to defend against the charge.

As for statutory rights, K.S.A. 22-3420 details the procedure courts should employ in handling jury questions. Jury questions shall be in writing, signed, dated, and submitted to the bailiff. The court shall notify the parties and offer a chance to discuss how to answer the question. The defendant must be present during this discussion unless the defendant waives that right. The statute also establishes a defendant's right to be present when the court responds to the jury's question. Thus, a statutory violation may occur if the court responds to a jury question in the defendant's absence. See K.S.A. 22-3420(d); see also K.S.A. 22-3405(a). But the failure to have the defendant present may not result in reversible prejudice. *Harrison*, 311 Kan. at 856-57.

Against this background, it is apparent that Alvarado-Meraz, at a minimum, must show the jury asked a question during deliberations and delivered that question to the court. The district court concluded Alvarado-Meraz failed to make this initial showing, and we see no abuse of discretion in its analysis.

### 1.2    *No abuse of discretion*

The senior judge summarized the testimony of 11 jurors and noted the affidavits submitted with Alvarado-Meraz' motion. This included an affidavit from a juror who died before the hearing. The senior judge also summarized the testimony of the judicial administrative assistant who acted as the bailiff and the trial judge.

The senior judge acknowledged that "most jurors remember questioning the legal requirements for premeditation, [but] their recall testimony was neither consistent nor conclusive as to how such question was resolved." He referred to there being a lack of "consensus" about what happened. He felt six possible scenarios developed about how the question was handled: (1) the jury communicated a question or questions about premeditation to the trial judge, which the trial judge answered in the jury room during deliberations, (2) the assistant working the trial brought the jury's question to the trial judge and brought his answer to the jury, (3) the assistant told the jury that she could not answer its question, (4) the assistant directed the jury back to the instructions after it asked her a question, (5) the jurors worked out an answer to the question without the court's assistance, or (6) the trial judge answered jury questions about premeditation after he came in after the verdict to thank the jury for its service.

The senior judge also noted that many of the various scenarios would have been contrary to the trial judge's well-established protocol for answering juror questions, a protocol that fully complies with constitutional and statutory standards. The senior judge commented that the trial judge had presided over more than 120 jury trials over his 16 years on the bench. "The notion that he would choose to ignore clear statutory directives; that he would deviate in this capital murder case from a procedure he has long followed; and that he would do so without the knowledge and participation of counsel and the defendant is frankly untenable." He also noted the testimony from the trial judge and the bailiff explaining that the uniform practice in their judicial district was to accept questions in the manner required by K.S.A. 22-3420(d).

Alvarado-Meraz argues we cannot accept the senior judge's view that the trial court handled the jurors' question in a way consistent with the district's policy and the Kansas statute because eight witnesses testified that they asked the court a question, and the defense did not know of the questions until it conducted posttrial interviews. He also

13

criticizes the senior judge requiring a "consensus" from the jurors, arguing that imposed too high a burden of proof on Alvarado-Meraz.

As to the burden, we do not read the senior judge as imposing a duty to prove a consensus. Rather, he referred to the lack of consensus among the jurors' testimony to highlight the wide inconsistencies in the jurors' memories about what happened. While eight jurors were willing to say there was a question or questions, they varied as to what it was, whether and how it was asked, and how it was answered. He used this inconsistency to weigh the credibility of the testimony. We thus do not find that the judge made a mistake of law as to Alvarado-Meraz' burden of proof.

As to Alvarado-Meraz' point that the district court must have deviated from the district policy and state statute, we disagree with the deference he asks us to accord some jurors' testimony. In our review of their testimony, very few jurors had a clear memory. Considerable time had passed, which could be why their testimony was full of uncertainty and was filled with hedging comments like "I think" and with them offering that their memories were not clear. While the judge and bailiff also could not recall if there was a question, they both laid out how they handle questions and how they would have acted routinely. That practice would have conformed with K.S.A. 22-3420(d).

Statements from several jurors, while often also filled with indecision and sometimes some contradiction, supported the view that no question was asked. The State sets out this testimony:

> "[J]uror R.B. testified that, while she had a poor memory, that she 'd[idn't] think anyone actually came in and clarified it [premeditation], but I think we had the written paper that had the definitions. But I don't remember exactly.' Juror M.D. was not always consistent, but testified in part that premeditation was discussed in deliberations and that he did not think anything was asked of the court during deliberations because the jury had the instructions. Juror A.J., who said she did not have a great memory, testified that the jury

14

had the definition of premeditation before deliberations, and that she did not think any questions were asked to the court during deliberations, nor did anyone other than the jury speak to them during deliberations beyond possibly asking if they needed lunch. Juror R.L.S. testified that [the trial judge] only came in after the verdict, and could not recall any questions during deliberations or any question being communicated to anyone outside the jury. Presiding juror A.C.'s memory was not perfect either, but he testified clearly that he spoke to 'No one' other than his fellow jurors during deliberations beyond perhaps buzzing the aide for water or lunch."

This testimony illustrates, at least, that the testimony was not as clear as Alvarado-Meraz sets it out to be. And it supports the view that no question was asked.

The senior judge considered all this evidence. In weighing credibility, he did not make a mistake of fact constituting an abuse of discretion even if he views some testimony in a different light than does Alvarado-Meraz. For us to pick and choose facts or portions of testimony to rely on as Alvarado-Meraz asks we do, we would overlook the witnesses' uncertainty, inconsistencies among their memories, and the testimony of those jurors who fully disagreed with his position. The vagueness, uncertainty, and sometimes contradictory statements of the various jurors contrast with the evidence in cases granting a defendant relief because of a trial court's handling of juror questions on which Alvarado-Meraz relies. Cf. *Euceda v. United States*, 66 A.3d 994, 1001-05 (D.C. 2013) (finding record sufficient to identify specific error alleged and review that error when record included a question signed by the foreperson and time-stamped received by the court).

A reasonable person could look at all this testimony and the lack of clarity and conclude Alvarado-Meraz failed to prove his right to be present during a critical stage of trial was violated. We affirm the senior judge's conclusion that there is no basis to grant Alvarado-Meraz' motion for a new trial.

15

ISSUE 2: No prosecutorial error during closing argument

In Alvarado-Meraz' second argument, he contends the prosecutor committed four acts of prosecutorial error during closing arguments. We find no merit to these arguments.

In conducting our review of this argument, we apply a two-step framework. First, we consider the prosecutor's statements in context to determine whether the prosecutor stepped outside the wide latitude afforded the State to conduct its case "'in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024) (quoting *State v. Brown*, 316 Kan. 154, 164, 413 P.3d 1207 [2022]). Prosecutors do not violate this wide latitude by highlighting evidence or discussing reasonable inferences drawn from that evidence so long as their arguments remain consistent with the evidence. *Coleman*, 318 Kan. at 302; see *State v. Waldschmidt*, 318 Kan. 633, 655, 546 P.3d 716 (2024). But prosecutors do exceed the wide latitude by, for example, misstating the law that applies to that evidence, misstating evidence, commenting on witness credibility, or shifting the burden of proof to the defendant. *Coleman*, 318 Kan. at 302. In assessing whether a prosecutor's statement is error, we consider "the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Z.M.*, 319 Kan. 297, 317, 555 P.3d 190 (2024) (quoting *State v. Hillard*, 313 Kan. 830, 843, 491 P.3d 1223 [2021]).

If we find error, we move to the second step of determining whether the error requires reversal. In doing so, we apply the traditional constitutional harmless error test established in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

16

## 2.1    *No error in arguing about shooter's location*

Alvarado-Meraz first criticizes the State's argument that bullet casings found on the scene indicate where the shooter stood while firing at Lucero and Manuel. He points to the following part of the prosecutor's argument:

> "So let's talk about what the evidence shows in this case. And we'll start with State's Exhibit No. 4 . . . it shows you the pattern of where the cartridge casings were located. And you'll remember these are not in the order in which they were fired. Nobody can tell you the order in which they were fired**.** *But it does show you a pattern. And if you'll note it starts—the pattern starts back here at the southeast bedroom. The evidence showed that this was the defendant's bedroom.* The pictures we'll look at show that there are cartridge casings along the east wall of that dining area right where Lucero was sitting eating her dinner. She was having dinner. Manuel was in the kitchen. Somebody had just been grating some cheese for their dinner. You will see that grater laying [*sic*] next to him on the ground and a plate with the cheese. *Somebody started walking toward them and firing. Firing into Lucero, firing into Manuel.*" (Emphases added to show disputed language.)

Alvarado-Meraz argues these statements are contrary to the evidence as he contends the expert's testimony precludes an inference that the ejected casings formed a pattern that suggested where the shooter stood. Our review of the evidence suggests the prosecutor drew a reasonable inference from the testimony.

In reaching that conclusion, we agree with Alvarado-Meraz that the crime scene investigator testified there could be variables that would affect where cartridges go. The expert testified that these include the design of the gun, the way the shooter holds the firearm, and the possibility people displace the casings. Despite these variances, the expert provided evidence about the general area where the shooter stood and explained why, despite the variances, a range could be designated. The circumstances that allowed her to draw her conclusion included the direction of fire that showed bullets moved from

17

south to north, the location of the wounds on the victims and the bullet holes, the neighbors' reports about the timing of the shots, and the visible pattern.

In supporting her testimony about the area where the shooter stood, the expert noted the bullet casings ranged from an area just outside Alvarado-Meraz' bedroom in the southeast corner of the apartment and into the kitchen—again, all in a south to north fashion as determined by the location of the bullets and bullet holes. Also, both victims were shot repeatedly from behind. Some testimony indicated both victims were shot exactly where they were found, which was in or near the dining area and kitchen to the north of Alvarado-Meraz' bedroom. Lucero had been sitting at the table, and Manuel was in the kitchen. The scene did not suggest either victim had time to intervene, retreat, or otherwise cause an interruption in the flow of the bullets during the time Manuel and Lucero were shot.

These various pieces of evidence support the State's argued inference that the shooting began somewhere near the entrance to Alvarado-Meraz' bedroom and provided evidence of where the shooter stood when firing. The State's closing argument asked the jury to draw reasonable inferences from these various pieces of evidence, including the expert's designation. The prosecutor did not err in asking the jury to draw these inferences.

2.2     *No error in arguing about guns' location*

Next, Alvarado-Meraz criticizes the State's position that Alvarado-Meraz had to get the guns he fired and that those guns were stored in his room. Alvarado-Meraz says there was no testimony from any witness recently in the apartment about where the guns were stored. While true, other evidence presented allowed an inference that the weapons were stored in Alvarado-Meraz' room before the killings.

18

Evidence suggested the firearms belonged to someone in the apartment. Photographs and videos showed Lucero and at least one of the twins at a firing range, Alvarado-Meraz and Lucero handling a long gun and a pistol, and Alvarado-Meraz in his bedroom with firearms that appeared to be the murder weapons. Alvarado-Meraz conceded in his closing the guns "were commonly owned, used, and available among [Alvarado-Meraz], Manuel, and Lucero." Without direct evidence, the prosecution inferred the firearms were in Alvarado-Meraz' bedroom based on the photographs and crime investigation results about the direction of the shots from the part of the apartment near Alvarado-Meraz' bedroom. Alvarado-Meraz argues the prosecutors erred in making three references about the guns' location.

In the first reference, the prosecutor stated: "They had to get the guns, plural. They didn't come out with a gun that they had on their hip. They had to go get a long gun. They had to fire two separate guns." This passage says nothing about the location of the gun but infers that the shooter had to retrieve a gun. While there is no direct evidence about how the shooter was armed before he began to fire, it was a fair inference that the shooter would retrieve at least the long gun before firing it because it does not appear to have been a weapon that could have been easily carried on one's person.

Another passage, one in the rebuttal argument, also leaves the question about the guns' location before the shooting to the jurors, asking: "Or is more likely that the guns were in the defendant's bedroom and he walks out and begins to shoot them[,] and they had no time to defend themselves?" This question was a reasonable one to leave to the jury for its decision.

In the third passage, the prosecutor most clearly pointed to the guns being stored in Alvarado-Meraz' bedroom. The prosecutor showed the photographs of Alvarado-Meraz holding the weapons, including in his bedroom. The prosecutor noted that Alvarado-Meraz "liked to take a picture of himself holding the murder weapon . . . both

19

of them." The prosecutor then turned to why Alvarado-Meraz would shoot the victims, noting there might never be an answer to that question. But he noted the possible disrespect from Manuel and pointed out there was no opportunity for a full confrontation about that question because Alvarado-Meraz "*went to his bedroom, got the guns, came back out*, fired into Lucero, fired into Manuel, hitting him in the legs, knocking him to the ground, and began unloading." (Emphasis added to show disputed language.)

While no direct evidence suggested the location of the guns, Alvarado-Meraz' concession that he had access to the guns, the photograph of him with the guns in his bedroom, and the evidence that the shooting was from the southern portion of the apartment where Alvarado-Meraz' bedroom and the living room are located, suggested the bedroom was a logical location for Alvarado-Meraz to have armed himself. No evidence suggested an apparent storage space in the living room near where the casings were located.

Given those facts, the State argued a fair inference in suggesting the location of the firearms before the shooting was Alvarado-Meraz' bedroom.

2.3     *No error in using the word "ambush"*

Alvarado-Meraz next contends the State erred when it said he ambushed Manuel and Lucero. Alvarado-Meraz contends the State used this term to support an inference that he had time to premeditate his actions but there was no evidence that he hid or concealed himself. Alvarado-Meraz' argument focuses on a portion of the definition of ambush he cites that refers to a waylay or someone lying in wait. But this ignores another key element of the definition and the term's common meaning that to ambush is to attack by surprise or suddenly. E.g., Merriam-Webster Online Dictionary; American Heritage Online Dictionary.

In making this argument, Alvarado-Meraz points to one statement by the prosecutors. But we consider statements in context to assess error. *Z.M.*, 319 Kan. at 317. The context of the prosecutor's argument explained:

> "So is there any question whoever did this had designs to kill, that they did this with premeditation? And is there any question that this was part of the same act or transaction? Because at the end of the day they used the same two guns—they used the same two guns to shoot both people. Both of them were shot with the same two guns. This is the same act or transaction. I don't have to prove it happened in the same shot or same moment, but certainly in the same act or transaction. There is no evidence that Manny saw his wife being killed and came to her aid or vi[c]e versa. The evidence would be that *they were both ambushed*.

> "Was it done with premeditation? The she[e]r number of times that they were shot and the she[e]r manner in which they were shot and the she[e]r types of weapons that were used indicate only one thing, that these killings were premeditated." (Emphasis added to show disputed language.)

With this additional context, we consider the alleged error. One consideration is the layout of the apartment, with Alvarado-Meraz' room adjacent to the living room. A person leaving Alvarado-Meraz' room would be in the living area, behind a small overhang that the wall of his closet created. That overhang provides some concealment from someone in the living room, dining area, or kitchen. Some casings fell near this overhang, others fell along the wall of Alvarado-Meraz' room, moving toward the dining area and kitchen. The evidence also reflected that Lucero was eating her dinner and Manuel was in the kitchen fixing himself a plate. Both apparently fell to the floor after the initial shots, and both were then repeatedly shot. Neither appeared to move toward the other before being shot or to flee. This evidence suggested the shootings were sudden and unexpected, offering no time for either spouse to react before collapsing to the ground.

21

The prosecutor argued a fair inference when he suggested the victims were ambushed.

2.4    *No error in stating the law on premeditation*

Alvarado-Meraz finally complains that the State erred in stating the definition of premeditation. He suggests the State's definition undercut the cognitive component of premeditation, the opportunity to have thought the matter over beforehand. *State v. Stanley*, 312 Kan. 557, 573-74, 478 P.3d 324 (2020). He points to a few sentences of the prosecutor's argument. We quote the surrounding material so we may consider the prosecutor's statements in context:

> "Premeditation, as the judge just defined for you, means to have thought the matter over beforehand. In other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than instantaneous intentional act of taking another's life. It can't happen that quickly (snapping). It has to be something more than that. *It doesn't have to be days or weeks or even hours or minutes of time of thinking, of planning, of lying in wait. That's not required. Premeditation simply requires that before you actually kill someone you decide I'm going to kill them. That's premeditation.*" (Emphasis added to show disputed language.)

The beginning of the State's recitation mirrors almost precisely the trial court's instruction on premeditation:  "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." Alvarado-Meraz does not challenge this jury instruction, one we have consistently upheld. *State v. Barnes*, 320 Kan. 147, 174, 563 P.3d 1255 (2025). In full context, the statement captures both the temporal and cognitive elements of premeditation discussed in the case Alvarado-Meraz relies on in making his argument. See *State v. Dotson*, 319

22

Kan. 32, Syl. ¶ 1, 551 P.3d 1272 (2024) ("Premeditation exists when the intent to kill arises before the act takes place and is accompanied by reflection, some form of cognitive review, deliberation, or conscious pondering. Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions.").

We see no error in the State's argument. The beginning of the statement emphasizes the cognitive component of premeditation. The later portion of the argument clarified that premeditation requires more than instantaneous action. Read in context, the prosecutor's statement does not misrepresent Kansas law.

### 2.5    *Prosecutorial error argument conclusion*

Having found no prosecutorial error, we need not reach the second step of the prosecutorial error inquiry. There is no error that may have caused harm.

ISSUE 3:  No error in not instructing on voluntary manslaughter

Alvarado-Meraz finally asserts there was evidence of provocation when Manuel gave him a hard time and called him a bitch. He asserts this provocation involved a sudden quarrel or heat of passion. Given that, he argues the judge erred when he did not instruct the jury on voluntary manslaughter as a lesser included offense of capital murder when Alvarado-Meraz asked for the instruction.

Appellate courts apply a three-step inquiry to jury instruction issues, asking: (1) whether the appellate court has jurisdiction or whether the issue has been preserved for review; (2) whether an instructional error occurred, that is whether the disputed

23

instruction was legally and factually appropriate when the entire record is reviewed in the light most favorable to the requesting party; and (3) whether, if error occurred, it is reversible, meaning is there a reasonable probability that any error affected the outcome of the trial in light of the entire record? *State v. Gallegos*, 313 Kan. 262, 266, 485 P.3d 622 (2021).

### 3.1    *Jurisdiction and preservation*

One of the first questions we ask in a jury instruction challenge is whether the court can and should review the issue. In other words, does the court have jurisdiction and did the litigant raise the question below? *Gallegos*, 313 Kan. at 266. As mentioned above, we have jurisdiction because this case involves a direct appeal from a capital murder conviction. K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (direct appeals to Supreme Court allowed for life sentence and off-grid crimes); K.S.A. 21-5401 (capital murder is an off-grid person felony). And Alvarado-Meraz requested a lesser-included jury instruction on sudden-quarrel voluntary manslaughter during the instruction conference. The issue is thus preserved.

### 3.2    *Legally appropriate but not factually appropriate*

Next, we consider whether an error occurred, assessing whether the requested instruction was legally and factually appropriate when viewed in the light most favorable to the requesting party. *Gallegos*, 313 Kan. at 266.

The parties do not dispute that the requested instruction was legally appropriate. We agree that the law supports that proposition. E.g., *State v. Becker*, 311 Kan. 176, 184, 459 P.3d 173 (2020) (jury instruction on voluntary manslaughter appropriate as lesser

included offense of premeditated murder); *State v. Martis*, 277 Kan. 267, 277-78, 83 P.3d 1216 (2004) (first-degree premeditated murder is a lesser-included offense of capital murder).

We now turn to the question of factual appropriateness. *Gallegos*, 313 Kan. at 267. "The core elements of voluntary manslaughter are an intentional killing and a legally sufficient provocation." 313 Kan. at 267. To constitute a legally sufficient provocation, the provocation must "deprive a reasonable person of self-control and cause that person to act out of passion rather than reason." 313 Kan. at 267 (citing *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 [2014]). "'Mere words or gestures, however offensive, do not constitute legally sufficient provocation'" justifying an instruction on voluntary manslaughter. *State v. Stafford*, 312 Kan. 577, 584, 477 P.3d 1027 (2020) (quoting *State v. Bernhardt*, 304 Kan. 460, 372 P.3d 1161 [2016]). Courts apply an objective standard to determine whether the provocation was legally sufficient. *Gallegos*, 313 Kan. at 267; *State v. Uk*, 311 Kan. 393, 397-98, 461 P.3d 32 (2020). And courts perform a gatekeeping function to ensure the purported provocation rises to the objective legal threshold of sufficient provocation before instructing a jury to consider whether a homicide was voluntary manslaughter. *Uk*, 311 Kan. at 398.

In this case, Alvarado-Meraz asserts that the provocation involved a sudden quarrel or heat of passion. Caselaw has defined sudden to mean "[h]appening without warning; unforeseen[;] [c]haracterized by hastiness; abrupt; rash[;] [c]haracterized by rapidity; quick; swift." *Gallegos*, 313 Kan. at 267 (quoting *State v. Parker*, 311 Kan. 255, 265, 459 P.3d 793 [2020]). A quarrel is "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *Gallegos*, 313 Kan. at 267-68 (quoting *Parker*, 311 Kan. at 265). And heat of passion means "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.'" *Gallegos*, 313 Kan. at 267 (quoting *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 [2012]).

The trial judge denied the requested instruction after applying an objective test to consider the sufficiency of the provocation. The trial judge explained:

"Any confrontation that is orchestrated or planned is the antithesis of a sudden quarrel, but that said, mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter. Furthermore, mere evidence of an altercation does not alone support the finding of sufficient provocation."

The trial judge then acknowledged the existence of some evidence of an argument between the brothers during which Manuel called Alvarado-Meraz a bitch. The trial judge reviewed all the unknowns surrounding the argument and any connection it may have had to Alvarado-Meraz ultimately killing Manuel and Lucero. There was no evidence of how the fight arose or when it arose relative to the killings, that is whether the killings occurred during a fight or some unspecified time after it. "And without that, it is just pure speculation on the part of the jury that this was a killing that was done in the midst of this argument." We agree. The evidence reflects a verbal altercation with no suggestion the argument would "deprive a reasonable person of self-control and cause that person to act out of passion rather than reason." *Gallegos*, 313 Kan. at 267.

In reaching this conclusion, we do not ignore Alvarado-Meraz' argument that some evidence suggested a physical fight. This argument rests on the autopsy finding that Manuel suffered blunt force trauma. Alvarado-Meraz asks us to consider this to be from a physical fight, even though there is no evidence of a fight and an expert stated the cut was consistent with Manuel falling after being shot. Any suggestion the trauma resulted from a physical brawl is countered by the physical evidence that Lucero was at the dinner table and Manuel was preparing to join her. Cf. *Gallegos*, 313 Kan. at 269 (evidence supporting lesser-included offense instruction may be repudiated by other evidence). Had a fight occurred, Manuel had walked away. Thus, even viewing the evidence in the light

26

most favorable to Alvarado-Meraz, we see in this record no evidence suggesting a fight involving intense or vehement emotional excitement of the kind constituting legally sufficient provocation.

Alvarado-Meraz also would like us to conclude that he would not have killed his twin with whom he had a good relationship if there had not been some sudden provocation. While their relationship may suggest any argument was unexpected, it does not necessarily establish that the argument was sudden let alone that anything in the argument constituted legally sufficient provocation to warrant a voluntary manslaughter instruction. And the suggestion of a good relationship does nothing to repudiate the crime scene evidence, which was not consistent with any legally sufficient provocation.

Finally, Alvarado-Meraz points to witness statements reporting that he appeared to be upset, speaking quickly, not in his right mind, or having a mental breakdown as giving rise to an inference that he was operating under extreme emotion at the time of the shootings. As the State argues, it is unclear when these communications occurred. The trial judge and jury heard no evidence that this was Alvarado-Meraz' state at the time he shot the guns. This lack of information means they do not weigh one way or the other as we consider the question of legally sufficient provocation.

Generally, we have found a voluntary manslaughter jury instruction factually inappropriate in circumstances like these. For example, in *State v. Gulley*, 315 Kan. 86, 92-94, 505 P.3d 354 (2022), we concluded a voluntary manslaughter instruction was not factually appropriate when there was some evidence of an argument before the killing, but no explanation was offered for how that quarrel constituted legally sufficient provocation given that words alone are not provocation. In *Gallegos*, we rejected a claim that the defendant reacted without thinking when the defendant's "conduct reveals a level of calculation that would negate any claim of completely spontaneous behavior." 313

27

Kan. at 269. And the fact the victim screamed and yelled for help did not justify giving the jury instruction because mere words or gestures are not sufficient grounds to justify the instruction. 313 Kan. at 269.

In short, this record lacks sufficient evidence to support a jury concluding that a reasonable person would have been deprived of self-control and acted out of passion rather than reason. The trial judge properly performed his role as a gatekeeper and declined to instruct the jury on voluntary manslaughter.

Because we have determined the requested instruction was not factually appropriate, we need not address whether Alvarado-Meraz suffered any harm from the trial judge's decision not to give the instruction. *Peters*, 319 Kan. at 519 (no error to not analyze error if the reviewing court concludes the requested instruction was not factually appropriate).

CONCLUSION

We do not discern any error in the issues Alvarado-Meraz raises. We therefore affirm his conviction of capital murder.

Affirmed.

WILSON, J., not participating.

28